756 So.2d 418 (1999)
STATE of Louisiana
v.
James S. ELLIS.
No. 99 KA 0425.
Court of Appeal of Louisiana, First Circuit.
December 28, 1999.
Rehearing Denied February 15, 2000.
*419 Walter Reed, District Attorney, Covington, Dorothy Pendergast, Metairie, for Appellee, State of Louisiana.
Patrick Fanning, New Orleans, for Appellant, James S. Ellis.
Before: CARTER, C.J., LeBLANC, and PETTIGREW, JJ.
CARTER, C.J.
The defendant, James S. Ellis, was charged by bill of information with aggravated assault with a firearm, a violation of LSA-R.S. 14:37.2.[1] He pled not guilty and, after trial by jury, was found guilty as charged. He subsequently was sentenced to five years at hard labor. The court suspended three years of the sentence and placed the defendant on probation for three years with a number of special conditions. The defendant has appealed, urging two assignments of error.

FACTS
The defendant and the victim, Mark Hatcher, were partners in a dirt-excavation business; however, because of problems between the two men, including alleged drug use by the victim, the business was dissolved. Subsequently, on November 2, 1996, the defendant and the victim were both working on a project at Robert Weiner's property. The victim worked at Weiner's property that morning. He got stuck and had to dump that load of dirt. The victim then left the property with another load of dirt.
When the defendant arrived at the property, he saw that there was a load of dirt blocking the road, so he loaded the dirt on the victim's equipment trailer. When the victim returned to the work site, he asked who moved the dirt onto his trailer and the defendant told him that he did. The victim then got on his trackhoe and began to work. The defendant approached the victim, jumped on the blade of the trackhoe, and pointed a large gun at the defendant's face. The defendant cocked the gun and then fired the gun at the ground beside the victim. The defendant also threatened to shoot the victim in the knees.
The victim could see that the gun was fully loaded. Thereafter, the defendant backed away, so the victim left the area and called the sheriffs department to report the incident. Deputy Billy Lee of the St. Tammany Parish Sheriffs Office was dispatched to the scene. Upon his arrival on the scene, Lee observed the defendant wearing a gun in a holster. Weiner told Lee basically the same story as the victim. The defendant did not make any claims of self-defense. Lee arrested the defendant.

ASSIGNMENT OF ERROR NUMBER ONE
In his first assignment of error, the defendant contends that the trial court erred in admitting statements made by him to his clergyman in his professional character as a spiritual adviser. In his brief to the court, the defendant argues that statements he made in a meeting with the victim, their wives, and Reverend Steven Trammell were privileged, and Trammell should not have been allowed to testify as to the contents of that meeting.
LSA-C.E. art. 511 provides:

Communications to Clergymen
A. Definitions. As used in this Article:
(1) A "clergyman" is a minister, priest, rabbi, or other similar functionary of a religious organization, or an individual reasonably believed so to be by the person consulting him.

*420 (2) A communication is "confidential" if it is made privately and not intended for further disclosure except to other persons present in furtherance of the purpose of the communication.
B. General rule of privilege. A person has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication by the person to a clergyman in his professional character as spiritual adviser.
C. Who may claim the privilege. The privilege may be claimed by the person or by his legal representative. The clergyman is presumed to have authority to claim the privilege on behalf of the person or deceased person.
A pretrial hearing was held regarding the state's intent to use at trial statements the defendant made to Rev. Trammell. At the hearing, Rev. Trammell testified that he was the pastor for six years at First Baptist Church of Folsom, Louisiana, and the defendant and the victim were members of that church. According to Rev. Trammell, on the evening of January 16, 1997, he had a meeting with the defendant, the victim, and their wives, at the church to discuss the instant incident. According to Rev. Trammell, no one stated that the meeting was confidential, but it was implied. The meeting was held in his office in the church and the door was closed for privacy. He stated that during the meeting he felt that he was acting as their pastor. He stated that it definitely was a closed meeting.
Rev. Trammell testified that at the time of the meeting he thought the conversation was confidential and he did not intend to reveal the contents of the meeting. He thought it would be covered by the clergyman privilege, but because he was not aware of the extent of the privilege, he sought legal advice regarding the situation after he was subpoenaed. Rev. Trammell understood that his role as a counselor was confidential. He felt that if he made a practice of revealing the contents of a meeting, it would hinder his counseling ministry because people would think they could not go to him in confidence. Until the hearing, Rev. Trammell had not discussed what happened in that meeting.
Rev. Trammell admitted that he thought they probably would go to court because at the end of the meeting he felt that they were not able to resolve the problem. He recognized that he might be called to testify regarding the meeting. However, he stated that anytime he counsels people, it is implied that it is confidential "when we leave, we don't go spreading what took place behind closed doors." Rev. Trammell did think it would go to court because of the intensity of the situation. However, he did not remember saying anything specifically about going to court. Rev. Trammell stated that if the court ruled that he could share the information, then he would feel obligated to do so.
The defendant testified that he was asserting the privilege and did not want the contents of the meeting with Rev. Trammell revealed. He expected absolute privacy in connection with the meeting. He stated he would not have gone to the meeting if he thought its contents would be revealed to the public.
Subsequently, the court issued written reasons for judgment, wherein it stated that the defendant's communication to Rev. Trammell was not confidential as there were three other people present in the counseling session, and there was no agreement that what was said would remain confidential. The court stated that the defendant could not reasonably expect the victim and his wife to remain silent concerning what was said during the counseling session, as a communication is generally not considered privileged if a third party is present.
Although the court determined there was no privilege and allowed Rev. Trammell to testify, we disagree and find that the court erred in making this determination. According to testimony by the *421 defendant and Rev. Trammell, the communication at the meeting was made privately and not intended for further disclosure. Although no one expressly stated that the communication was private, Rev. Trammell testified that it was implied that the meeting was private. The meeting was held after work hours in his office at the church with the door shut. The defendant testified that he thought the meeting was private and would not have attended the meeting if he thought the contents thereof would be made public. Under LSA-C.E. art. 511(B), the defendant has a privilege to refuse to disclose and to prevent another person from disclosing a confidential communication made by him to a clergyman in his professional character as a spiritual adviser.
Although the state argues in its brief to this court that Rev. Trammell was not acting as a spiritual adviser but as a mediator, we disagree. Rev. Trammell could certainly have been construed as acting in his professional capacity as a spiritual adviser, as he was the pastor of the church attended by both parties. They met with him in his office at the church for a counseling session regarding the incident at issue. Rev. Trammell was the pastor of their church and was attempting to counsel the couples in order to help them reconcile their differences. While the state would like to term him as a mediator and not a spiritual adviser, the state failed to show, and we fail to see, how a pastor of a church meeting with members of his church in a private meeting, at the church, in order to help them reconcile their differences does not fall within his professional capacity as a spiritual adviser. Considering the above, we find that the trial court erred in determining that there was no privilege and allowing Rev. Trammell to testify regarding the contents of the meeting.
Because we find this admission of testimony to be error, we must now determine whether it was harmless error. The test for determining whether an error is harmless is whether the verdict actually rendered in this case "was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993).
In the instant case, Robert Weiner testified that he was at the scene of the instant crime and observed the defendant point a gun at the victim's face. According to Weiner, the gun was "pretty close" and could have been touching his face. He then observed the defendant pull the gun away from the victim's face, point it at the ground, and shoot the gun one time into a pile of dirt. The defendant then pointed the gun at the victim again. Weiner did not see an aggressive action by the victim and did not see movement by the machinery driven by the victim. Weiner did not hear any verbal threats by the victim.
Lawrence Emmons testified that he went to the scene on the date of the instant crime to move some equipment. When he pulled up to the scene he observed the defendant and the victim having a discussion. The defendant had a large gun pointed in the victim's face. Emmons decided to get out of there because he did not want to see anyone get killed. After he left the area, he heard a gunshot. According to Emmons, the victim's equipment was stopped, and he did not see the victim make any aggressive movements toward the defendant.
Sanford Pierre testified that he was working for the defendant at the time of the instant crime. He was at the work site and heard the defendant say that he put the dirt on the trailer and he was "going to handle it." The defendant then opened his jacket, and Pierre saw defendant's gun which was in a shoulder holster. According to Pierre, the defendant did not seem scared or nervous. At this point, Pierre's wife told the defendant that they had something else to do and they left the area. After the incident, Pierre went to help the defendant get out of jail. Upon exiting the jail, the defendant told him, "if he had known it was a felony and not a *422 misdemeanor he would have [sic] never done it." The defendant did not tell him he was acting in self-defense, that the victim made an aggressive movement toward him, or that the victim had a weapon.
The victim testified that he had been at the scene working when he got stuck and had to dump a load of dirt. The victim left the work site but subsequently returned and saw that someone had put a load of dirt on his equipment trailer. When the victim questioned the defendant and Weiner, who was also there, about who put the dirt on the trailer, the defendant told the victim that he did. The victim walked away and got on his trackhoe and began working. When he looked up, he saw the defendant standing on the blade in front of the trackhoe. The defendant then pointed a gun between the victim's eyes. According to the victim, the defendant "shoved [the gun] to his head."
The victim stated that the defendant had the gun cocked, took his thumb off the hammer six times, and fired the gun one time right beside the victim. After firing the gun, the defendant shoved the gun back to the victim's head and continued to talk about shooting him. After firing the shot, the defendant told the victim that he was not going to kill him, but was going to "blow [his] knees out." The defendant further told him that he was going to see him suffer before he "put this through your head." The victim knew the gun was loaded because he could see bullets in the chamber. Subsequently, the defendant backed away and the victim got up, walked to his truck, and left the scene. He went to a convenience store where he called the sheriffs department. The victim denied making any aggressive movements toward the defendant.
The defendant testified that his business partnership with the victim broke up because of the victim's crack cocaine use. When the defendant told the victim about dissolving the business, the victim threatened to hurt the defendant and blow up the equipment. The defendant indicated that he was scared of the victim because he was much bigger than he was and the victim carried a gun in his truck. The defendant claimed that the victim intentionally left the pile of dirt in the road to block his access to the site, so he moved the dirt to the victim's equipment trailer. Subsequently, the victim arrived on the scene, asked who moved the dirt, and the defendant responded that he had. The victim got on his trackhoe. Defendant walked to the victim's equipment with his gun showing and stated that they needed to talk.
The defendant claimed that the victim had his hands on the controls and threatened to knock him down with the equipment. In order to get out of the way, so the victim could not knock him down, the defendant jumped on the blade of the machine. According to the defendant, the victim appeared to be on crack cocaine, so he pulled out his gun and cocked it. The defendant admitted firing the gun at one point after the victim commented that the gun probably was not loaded. The victim threatened to hit him with part of the machine, so the defendant told him that if he moved, he would shoot his kneecaps. Weiner then told the defendant he ought to "leave things alone." The defendant agreed and walked away with Weiner.
Rev. Trammell testified that during his meeting with the victim and the defendant, the defendant did not claim that he acted in self-defense or that the victim made an aggressive move toward him. Rev. Trammell testified that at one point in the discussion, the defendant stood up and said he "sure did do it and he'd do it again.... [and] he would finish it this time." Rev. Trammell also testified about the defendant's alcohol problem and the victim's cocaine problem.
The defendant claimed the statement he made to Rev. Trammell during their meeting was, "Trust me, if we had it all over to do again, the outcome would be different, because we would have never gone into *423 business together." He also admitted pointing the gun at the victim but claimed that he did not touch the victim with the gun, which was about six inches away from the victim's forehead.
Considering the evidence, particularly the overwhelming evidence of the defendant's guilt, we find that the defendant was not prejudiced by Rev. Trammell's testimony. The guilty verdict rendered in this trial surely was not attributable to any error in admitting Rev. Trammell's testimony. Considering the above, we find no indication the defendant was unable to obtain a fair trial because of the admission of this testimony. Accordingly, while the trial court erred in admitting Rev. Trammell's testimony, the error was harmless, as the verdict was surely unattributable to the error. Therefore, we find this assignment of error to be without merit.

ASSIGNMENT OF ERROR NUMBER TWO
In his second assignment of error, the defendant contends that the sentence imposed by the trial court was excessive and constituted cruel and unusual punishment. In his brief to this court, the defendant argues that he was charged with an offense that existed as a felony for only a brief period of time. Prior to the enactment of the statute, he would have been charged with a misdemeanor with a maximum sentence of six-months imprisonment. If he were charged today, he would only be charged with a misdemeanor since that statute has been changed. Therefore, he claims although he was a first-time offender, he received a sentence much greater than the maximum penalty now in effect.
The defendant was sentenced on June 5, 1998. He subsequently filed a written motion for reconsideration of sentence wherein he claims the sentence was excessive. The motion was denied by the trial court.
At the time the defendant committed the crime, the penalty for a defendant convicted of aggravated assault with a firearm was a fine of not more than five thousand dollars or imprisonment for not more than five years, with or without hard labor. LSA-R.S. 14:37.2(C)(prior to its amendment by 1997 La. Acts No. 936, § 1). Thus, the defendant's sentence of five years at hard labor with three-years suspended and three years probation was within the statutory requirements.
Although a sentence falls within statutory limits, it may be excessive. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). LSA-Const. art. 1, § 20 prohibits the imposition of excessive punishment. A sentence is constitutionally excessive if it is grossly disproportionate to the seriousness of the offense or is nothing more than a purposeless and needless infliction of pain and suffering. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm to society, it shocks the sense of justice. The sentence imposed will not be set aside absent a showing of manifest abuse of the trial court's wide discretion to sentence within the statutory limits. State v. Lobato, 603 So.2d 739, 751 (La.1992).
LSA-C.Cr.P. art. 894.1 sets forth items which should be considered by the trial court before imposing sentence. The court shall state for the record the considerations taken into account and the factual basis for imposing sentence. LSC.Cr.P. art. 894.1(C). The trial court need not recite the entire checklist of Article 894.1, but the record must reflect that it adequately considered the guidelines. State v. Herrin, 562 So.2d 1, 11 (La.App. 1st Cir.), writ denied, 565 So.2d 942 (La. 1990). Maximum sentences are reserved for cases involving the most serious offenses and the worst offenders. State v. Easley, 432 So.2d 910, 914 (La.App. 1st Cir.1983).
During the sentencing hearing, the trial court stated that it was astounded at the actions of the defendant by going out to the work site with a loaded gun and firing *424 the gun in an open field with a number of people in the area. The court noted that someone could have been seriously hurt. The court indicated that there was an undue risk that during a period of a suspended sentence and probation that the defendant would commit another crime, and that the defendant was in need of correctional treatment or a custodial environment that could be provided more effectively by his commitment to an institution. The court felt that a lesser sentence would deprecate the seriousness of the offense. The court stated that it did not understand how the defendant could put someone "in fear of his life like he did." The court stated that in this situation a "totally suspended sentence" would be out of the ordinary.
We find that the record supports the sentence imposed. The defendant pointed a loaded and cocked gun at the forehead of the victim. Although witnesses testified that the gun was touching the victim's head, the defendant denied he touched the victim with the gun. However, he admitted it was six inches away from the victim's forehead. He also fired the gun next to the victim which endangered not only the victim but others in the area. While the defendant may have been upset because of business problems with the victim, there was no indication, other than the defendant's self-serving testimony, that the victim physically threatened the defendant such as to justify the defendant's actions.
After reviewing the record, we are unable to find that the trial court abused its discretion in sentencing the defendant. The sentence imposed is not grossly disproportionate to the severity of the crime, in light of harm to society, or so disproportionate as to shock our sense of justice. This assignment of error is without merit.

CONCLUSION
For the foregoing reasons, the conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.
NOTES
[1] 1997 La. Acts No. 936, § 1 amended and reenacted LSA-R.S. 14:37.2 to provide for aggravated assault upon a peace officer with a firearm.