818 So.2d 34 (2001)
STATE of Louisiana
v.
Ryan CROTWELL.
No. 2000 KA 2551.
Court of Appeal of Louisiana, First Circuit.
November 9, 2001.
*36 Honorable Charles Shropshire, District Attorney, Jesse L. Means, Jr., Assistant District Attorney, St. Francisville, LA, for appellee, State of Louisiana.
Samuel C. D'Aquilla, Jackson, LA, for defendantappellant, Ryan Crotwell.
*37 Before: PARRO, FITZSIMMONS, and GUIDRY, JJ.
FITZSIMMONS, J.
Defendant, Ryan Crotwell, was charged by grand jury indictment with second degree murder, a violation of La.R.S. 14:30.1. Defendant pled not guilty and not guilty by reason of insanity. After a trial, the jury returned a unanimous verdict of guilty as charged. Defendant filed a motion for post verdict judgment of acquittal. The trial court denied this motion and sentenced defendant to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence.

FACTS
On the morning of April 22, 1999, defendant, then fifteen years old, was sleeping at the home of his fifteen-year-old cousin, Jeremy Smith. Beth Ross, Jeremy's mother, called the home and learned that Jeremy had not gone to school. She spoke with her son over the telephone and told him that he was to help cut the grass in the yard. At the time, Rickey Ross (the victim), Beth Ross's brother-in-law, was cutting the grass on a riding lawn mower. The victim lived with his girlfriend, Mary, in a house trailer behind the trailer of Beth Ross and her husband, Wayne Ross, the victim's brother.
Instead of going outside, Jeremy and defendant discussed running away. The boys talked about using Wayne Ross's truck. They discussed what items to take with them, including guns in Smith's home that they could sell for cash. Jeremy then showed defendant guns located in his mother's bedroom. The boys talked about how to leave without trouble from the victim, Rickey Ross. Defendant suggested that they "do him," which Jeremy understood to mean to kill the victim, and both boys laughed. Jeremy, who thought that defendant was joking, left the bedroom to go outside to start doing yard work. Defendant stayed inside. A few minutes later, Jeremy heard two shots. When he turned toward the front yard, he no longer heard the lawn mower motor running and no longer saw the victim sitting on the mower. As Jeremy ran inside, he saw defendant, who was standing near a window facing the front yard, putting a gun down on the floor. The window was shattered and defendant looked like he was going to cry. Defendant stated that Jeremy should "take care of Mary." Jeremy called his mother at work, and she called the police to report the shooting. She also called nearby neighbors, James Lee Beitler and Helen "Libby" Harrison, and asked them to go to Mrs. Ross' home. Before he received the telephone call from Mrs. Ross, Mr. Beitler heard two shots about one or two minutes, not seconds, apart.
When Mr. Beitler first arrived at the Ross house, he could not find the victim, but he heard defendant on the back porch crying. He found defendant jumping up and down and crying, "I shot him." After finding the victim and seeing that he was dead, Beitler returned to the back porch and asked defendant about the location of the gun. Defendant did not respond to that question, but said "[W]e had to kill Buck [the victim] and Mary [the victim's girlfriend] because they was [sic] going to tell." Beitler then checked on the victim's girlfriend and found that she was safe. When he returned, Mr. Beitler heard Jeremy Smith screaming, "I was only f'ing joking." Beitler testified that defendant looked scared.
Ms. Harrison also testified that when she arrived at the Ross house she saw defendant sitting on the porch saying, "I shot him." When she asked Jeremy what happened, he responded, "I was only joking. *38 I was just kidding. I didn't think he... would do it."
East Feliciana Parish Sheriff's Office Detective Don McKey responded to the shooting report and saw defendant, who was crying and upset, at the scene. When he told defendant to calm down, defendant responded that he had just killed a man. Detective McKey located the gun, which had one spent round and two or three live rounds left in the weapon. The gun was a.270 bolt action rifle with a telescope. No identifiable fingerprints were found on the cartridges or the gun.

SUFFICIENCY OF THE EVIDENCE
In assignment of error number one, defendant contends that the evidence was not sufficient to convict him of the offense of second degree murder. Specifically, he contends that the state did not prove the element of specific intent or his identity as the shooter beyond a reasonable doubt. Defendant merely argues that "it is obvious" that he did not have the intent to kill or inflict great bodily harm, and that while he and Jeremy joked about killing the victim, he had no motive to commit such a crime. Defendant explains that his statements regarding killing the victim were made out of fear and confusion. As to his identification as the shooter, defendant merely argues that there were no eyewitnesses to the murder and that no fingerprints were found to match his fingerprints.
The state argues that it proved the element of specific intent from the evidence that Jeremy was outside when the shots were fired from inside the trailer, that defendant made inculpatory statements, and that defendant loaded and used a gun that contained a telescope. The state further argues that identity was proven by the testimony of Jeremy Smith that only he and defendant were in the house that morning, coupled with the evidence of defendant's inculpatory statements.
The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. See La.Code Crim.P. art. 821; State v. Johnson, 461 So.2d 673, 674 (La.App. 1st Cir. 1984). The Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard of review incorporated in Article 821 is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La.R.S. 15:438 provides that the fact-finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence. This court will not assess the credibility of witnesses or reweigh the evidence to overturn a fact finder's determination of guilt. State v. Powell, 94-1390, p. 7 (La.App. 1 Cir. 10/6/95), 671 So.2d 493, 498, writ denied, 95-2710 (La.2/9/96), 667 So.2d 529.
La.R.S. 14:30.1 A(1) provides:
Second degree murder is the killing of a human being:
When the offender has a specific intent to kill or to inflict great bodily harm; ...
Specific "intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). Specific intent may be proved by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or *39 facts depicting the circumstances. State v. Overton, 596 So.2d 1344, 1357 (La.App. 1st Cir.), writ denied, 599 So.2d 315 (La.1992).
Jeremy Smith's trial testimony was consistent with his second taped statement to the police, which was also played at trial. Jeremy stated that defendant had been the one who suggested killing the victim. During their conversation, defendant told Jeremy, "I'm gonna do him [the victim] and you're gonna watch." Jeremy did not take defendant seriously. When he went outside to begin the yard work, Jeremy heard two shots. Jeremy ran inside and saw defendant "freaking out." Defendant told Jeremy that he needed to kill Mary. Jeremy disagreed and said that he had been joking. Jeremy gave defendant the keys to his stepfather's vehicle and told him to flee the house. Defendant left in the truck, but while Jeremy was on the telephone with the police, defendant came back and said he wanted to turn himself in to the police.
In his taped statement, Jeremy recalled a time when defendant had a fight with a friend and told the friend that he was going home to get a gun to shoot him. As a witness on defendant's case-in-chief, Jeremy Smith denied talking about killing anyone before that day. He testified that the phrase in his taped statement, "we talk about it all the time," was a reference to running away, not killing anyone.
Defendant testified that on the morning of the shooting Jeremy woke up about 8:30 a.m. or 9:00 a.m. Subsequently, Jeremy spoke with his mother by telephone. She had discovered that he had been skipping school for about three weeks. Defendant testified that he was also in trouble for covering up for Jeremy and the boys began talking about running away together. According to defendant, Jeremy suggested that they steal guns to sell for money they needed. When defendant asked what they would do with the victim, Jeremy stated, "we're going to have to waste him." At first, defendant did not know if Jeremy was joking, but Jeremy then suggested that both the victim and his girlfriend, Mary, be killed. Jeremy wanted defendant to shoot either of the couple, but defendant responded that he could not do so. Defendant testified that he did not take Jeremy seriously because they never had done anything like the shooting.
According to defendant, Jeremy then took him to his mom's room and showed him guns located in her closet and under her bed. Jeremy took one of the guns, handed it to defendant and said that they would use it to shoot the victim. Jeremy suggested that defendant shoot the victim from inside the house to prevent a loud noise. Defendant said, "all right," and the boys loaded the gun. Then, Jeremy called defendant "a pussy ... wussy," and claimed that defendant would not be able to shoot the victim; rather, defendant would have to "take care of Mary." Defendant claimed that he went outside while Jeremy stayed inside and killed the victim. When defendant returned to the house, Jeremy began saying he did not know what to do and did not want to go to jail. Jeremy told defendant to leave in the truck and that Jeremy would cover up the shooting. However, Jeremy returned to the house, went inside and locked the house. Defendant left in the truck, but soon returned to the house. As he tried to get inside the locked house, defendant was stunned to hear Jeremy tell the police dispatcher that defendant had shot the victim. Defendant further claimed that he did not remember making any statements in which he admitted killing the victim. However, he said things to doctors on the sanity commission to "look crazy" so that he would be released. He also explained that he "took the rap" for Jeremy because *40 Jeremy was "like my brother" and could not make it in jail.
In an attempt to support his theory that Jeremy Smith shot the victim, defendant called Jeremy's friend, Matt Griffin, to testify. Griffin testified that Jeremy showed him guns located in his mother's closet and a shotgun in Jeremy's bedroom. He recalled an incident about three months before the shooting when Jeremy ran away into the woods with a shotgun. Additionally, in her testimony, Beth Ross stated that Jeremy admitted showing his stepfather's guns to a friend.
In the two months before the shooting, defendant was seen by Dr. Carmen Sugai, a child psychiatrist in Baton Rouge. The doctor conducted an evaluation of defendant in February and had a follow-up session in March. At the February session, defendant was conscious, coherent, and oriented, with no evidence of auditory or visual hallucinations. While defendant expressed wanting to die, he was not suicidal or homicidal. Rather, he felt sad and irritable. Dr. Sugai's diagnosis was major depression and oppositional defiant disorder. At trial, the doctor explained that major depression is a clinical syndrome, characterized by mood change, particularly sad moods often associated with guilt feelings, negative thought processes, suicidal idealizations, or death wishes. In teenagers, it is expressed as irritability and aggressiveness. Oppositional defiant disorder syndrome in childhood is characterized by difficulty following rules and disrespect and defiance to authority figures. During the February session, Dr. Sugai prescribed an anti-depressant medication, with no major side effects, to improve and regulate mood. At the March session, defendant had improved moods, and his mother said he seemed less irritable and less argumentative. At trial, Dr. Sugai noted that defendant had been hospitalized twice, at ages nine and ten. Nevertheless, when asked by the prosecutor whether the doctor had any reason to believe that defendant did not know the difference between right and wrong, Dr. Sugai said no.
On rebuttal, the state called Dr. David Post to testify. Dr. Post met with defendant on two occasions to determine defendant's mental state at the time of the shooting. He took a detailed history of defendant's development, schooling, medical conditions, and exposure to mental health services. He also reviewed records from defendant's hospitalization at Southeast Hospital in Mandeville and Dr. Sugai's reports. Dr. Post diagnosed defendant with conduct disorder, moderate to severe ADHD and mild depression. Although Dr. Post concluded that defendant had legitimate mental health problems, defendant was able to distinguish between right and wrong at the time of the shooting.
We believe that the evidence was sufficient for the jury to find that defendant was the shooter. It is obvious that the jury chose to believe the testimony of Jeremy Smith and other witnesses rather than that of defendant. Only two persons, defendant and Jeremy Smith, were in the house prior to the shooting.
We also find that there was sufficient evidence that defendant had the specific intent required for the offense of second degree murder. Minutes before shooting the victim, defendant talked about killing the victim and his girlfriend as a way to run away with Jeremy. Defendant obviously loaded the gun, which had a telescope, with several rounds of ammunition. He aimed and fired the gun at the victim, shooting him in the back and fatally wounding him. It is obvious that this shooting was not accidental or a joke gone awry.
*41 After a careful review of the record, we find that the evidence supports the jury's determination. We are convinced that a rational trier of fact, viewing all of the evidence as favorable to the prosecution as any rational fact finder can, could have concluded that the state proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the defendant was guilty of the instant offense.

COMMENT BY STATE ON DEFENDANT'S SILENCE
In assignment of error number two, defendant essentially contends that the trial court erred in denying his motion for mistrial based on comments by the prosecutor on defendant's silence. Defendant contends that these references to his silence were made during his cross-examination and during the state's closing argument.
The state contends that there was no violation of defendant's right against self-incrimination because some of the prosecutor's questions concerned defendant's prearrest silence. It further argues that the prosecutor's comments during closing argument were related to defendant's trial testimony and "merely raised the question as to why the defendant waited until trial to declare his innocence when he had ample opportunity to do so prior to trial."
Defendant testified on his own behalf at trial. He denied shooting and killing the victim and stated that Jeremy was the shooter. Defense counsel asked defendant why he did not tell the police that Jeremy had shot the victim. The pertinent part of the colloquy between defendant and his counsel is as follows:
Q. You didn't make any statements to the police, did you?
A. No, sir.
Q. Why didn't you make any statements to the police?
A. My parents advised me not to because [the detectives] said my parents had to sign before I could make a statement.
On cross-examination, the prosecutor continued this line of questioning and asked defendant about his statements that he killed the victim. When the prosecutor questioned defendant about his failure at the scene to respond to his mother's questions about the shooting, defense counsel objected and explained that the questions were from defendant's grandfather, not the mother. Notably, no objection was made by defense based on impermissible references to the defendant's silence. That portion of the cross-examination is as follows:
Q. Do you remember sitting on the picnic table when your mother kept asking you why did you do such a thing, why did you do such a thing, and you didn't respond?
A. No, sir.
Q. Do you remember going ...
(Utterance made from individual in audience.)
BY MR. D'AQUILLA: Your Honor, I'm going to object. I don't know if his mother was there. I believe somebody may have been there ...
BY THE COURT: Mr. D'Aquilla, it's cross examination. If we hear anymore outbursts from the audience, you will be removed from the Courtroom.
BY MR. D'AQUILLA: Your Honor, for the record, I believe Mr. Crot-well's grandfather was at the house as opposed to his mom.
The prosecutor continued to press defendant, again without any objection by defense based on defendant's decision to *42 remain silent. The pertinent parts of the prosecutor's cross-examination are as follows:
Q. Okay. At that point why didn't you, when you went back to the jail, tell one of the detectives, look, I want to tell you what happened. It wasn't me; it was Jeremy. Why didn't you do that?
A. Because my parents said it was in my best interest not to give a statement.
Q. Even though it would have exonerated you?
A. I don't know. I don't know anything about the system.
Q. So, you thought it was better not to say anything and be charged with second degree murder rather than tell the police what actually happened; is that right?
A. I didn't think anything about that.
* * *
Q. Did it ever occur to you that it might be in your best interest to tell somebody before today that you were not the one that killed Buck Ross?
BY MR. D'AQUILLA: Your Honor, Mr. Crotwell has answered that question three or four times. He stated that on the advice of his parents he did not make any other statements regarding that.
BY THE COURT: Objection overruled. Continue, Mr. Carmichael.
Q. I will repeat the question. Did it ever occur to you to tell anyone before today that you did not kill Buck Ross?
A. Yes, sir.
Q. Why didn't you?
A. Because my parents said not to.
Q. What about your lawyer? Did you ever tell your lawyer?
A. My lawyer's [sic] told me to keep my mouth shut.
Q. My question was did you tell your lawyer that you didn't kill Buck Ross?
A. A few days before my trial I did.
Q. A few days before today?
A. Yes, sir.
* * *
Q. So, before just a few days ago you didn't tell anybody that you didn't do it?
A. I told a couple of my friends.
Q. Who?
A. That was in jail with me. They are the only ones that know.
Q. Nobody else?
A. I guess a few of the deputies. I don't know. A few people asked me. I never really said anything in jail. People just had a story going around about me. I just never argued with them. I just didn't say anything.
Q. You've been in jail for how long?
A. Over a year.
Q. And you didn't think that you should tell somebody the truth?
A. I didn't know. I did what my parents told me to do.
None of the objections made by defense counsel during testimony were directed to the defendant's right to remain silent. Defense counsel did not specifically object until the state's closing argument. The prosecutor was arguing that the evidence established that defendant was the shooter. The prosecutor referred to defendant's pre-arrest statements admitting the shooting and his trial testimony denying being the shooter and claiming that Jeremy was the shooter. He also noted defendant's statements made to Mr. Beitler, Ms. Harrison, and Det. McKey. Arguing that the question for the jury was who to believe, the prosecutor stated, in pertinent part:
When you go into the jury room, don't think that you have to leave all your life *43 experiences and all your common sense outside. You don't. You're supposed to use those to determine who's telling the truth. You're supposed to use those in making a credibility determination. He's been in jail over a year, and he never told anybody that he didn't do it. Think about it. On the advice of his parents.
BY MR. D'AQUILLA: Your Honor, I'm going to object. I'd like to request a mistrial. Mr. Crotwell has been in jail for a year. This is reference to a statement that his right to remain silent Mr. Crotwell has a right to remain silent. He remained silent for a year on the advice of his parents while he was in jail. Mr. Carmichael's making reference to that. We request a mistrial on that ground, Your Honor.
BY THE COURT: I'll overrule the request, Mr. D'Aquilla. Mr. Carmichael is referring to inferences drawn from the testimony.
The United States Supreme Court has held that an accused's post-arrest silence is "insolubly ambiguous." Doyle v. Ohio, 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91 (1976). Because a jury is apt to draw inappropriate inferences from the fact that a defendant chose to remain silent, "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." Doyle v. Ohio, 426 U.S. at 619, 96 S.Ct. at 2245; State v. Stelly, 93-1090, pp. 5-6 (La.App. 1 Cir. 4/8/94), 635 So.2d 725, 728, writ denied, 94-1211 (La.9/23/94), 642 So.2d 1309.
"[T]he prosecutor may not use the fact of an accused's exercise of his constitutional right to remain silent, after he has been advised of this right, solely to ascribe a guilty meaning to the silence or to undermine by inference an exculpatory version related by the accused for the first time at trial." State v. Arvie, 505 So.2d 44, 46 (La.1987). However, it is well settled that where one side has gone partially into a matter on examination-in-chief, the other side may go fully into it on cross-examination. State v. Edwards, 420 So.2d 663, 675 (La.1982).
The Louisiana Supreme Court has indicated that under La.Code Crim.P. art. 771, when the prosecutor or a witness makes a reference to a defendant's post-arrest silence, the trial court is required, upon the request of the defendant or the state, promptly to admonish the jury. In such cases where the court is satisfied that an admonition is not sufficient to assure the defendant a fair trial, upon motion of the defendant, the court may grant a mistrial. State v. Kersey, 406 So.2d 555, 560 (La.1981); State v. Stelly, 93-1090 at p. 6, 635 So.2d at 728. However, absent a timely objection, defendant generally waives the defect. State v. Hilburn, 512 So.2d 497, 502-503 (La.App. 1st Cir.), writ denied, 515 So.2d 444 (La.1987); State v. Hookfin, 476 So.2d 481, 487 (La.App. 1st Cir.1985).
Defense counsel first opened the door to questions about defendant's pre-arrest and post-arrest silence. On cross-examination, the prosecutor attempted to impeach defendant's new claims and to persuade the jury that defendant was lying in his trial testimony that Jeremy Smith shot the victim. That testimony elicited by the prosecutor was submitted without any objection based on the defendant's decision to remain silent. Under these particular facts, the references during cross-examination to defendant's silence present no basis for a finding of reversible error. "The circumstances do not warrant making an exception to the contemporaneous objection rule." State v. Arvie, 505 So.2d at 48.
*44 In closing, the prosecutor reiterated his argument that defendant lied when he testified that another person committed the crime because defendant had remained silent, and failed to make that claim, for over a year before trial. Defendant specifically objected. The trial court denied the objection and noted that the prosecutor was not focusing the jury on defendant's decision to remain silent, but was commenting on information given the jury by the defendant, either in direct examination or on cross. See State v. Probst, 623 So.2d 79, 87 (La.App. 1st Cir.), writ denied, 629 So.2d 1167 (La.1993).
Although defendant did open the door on direct examination for the reasons for defendant's silence, that was not sufficient to cleanse the impermissible reference to defendant's silence in closing argument after defense objection. Defendant's case is essentially the same as that in Doyle v. Ohio. The prosecutor directly referred to defendant's silence as a basis for impeachment. Under Doyle, it was "fundamentally unfair ... to allow [defendant's] silence to be used to impeach an explanation subsequently offered at trial." Doyle v. Ohio, 426 U.S. at 618, 96 S.Ct. at 2245. After the defendant's objection, the trial court should have, at least, admonished the jury. See La.Code Crim.P. art. 771.
However, we must still determine whether the reference to defendant's silence was harmless, under the circumstances here, or the basis for reversal. The test for harmless error is whether the guilty verdict "was surely unattributable to the error." State v. Ellis, 99-0425, p. 5 (La.App. 1 Cir. 12/28/99), 756 So.2d 418, 421.
After considering the evidence, including statements by defendant at the scene admitting that he shot someone, and the information on defendant's silence already presented to the jury by the defendant on direct and unobjected to cross-examination, we find that the guilty verdict was not attributable to the reference in closing argument. From our review of the record, the assignment of error provides no basis for reversal.

BACKSTRIKE JURORS
In assignment of error number three, defendant contends that the trial court erred in denying defendant's request to backstrike potential jurors before they were sworn. Defendant argues that at the time he made his request, he had numerous peremptory challenges remaining.
The state argues that although the defense attorney asked the judge about backstriking jurors, defendant never actually requested to backstrike any particular prospective juror. The state further argues that the defense attorney only objected to that ruling after all of defendant's peremptory challenges were used and that the error, if any, was harmless.
In State v. Watts, 579 So.2d 931 (La.1991), the Louisiana Supreme Court granted writs, reversed the ruling of the trial court and stated, "A juror temporarily accepted and sworn in accordance with LSA-C.Cr.P. Art. 788 may nevertheless be challenged peremptorily prior to the swearing of the jury panel in accordance with LSA-C.Cr.P. Art. 790. LSA-C.Cr.P. Art. 795(B)(1)." Since the jury panel is not sworn until all individual jurors and alternates have been selected, under La. Code Crim.P. art. 790, peremptory challenges may be exercised even after jurors are tendered under subsection (A) of Article 788. In other words, peremptory challenges are exercisable at any time before the jury panel is sworn. State v. Taylor, 93-2201, p. 22 (La.2/28/96), 669 So.2d 364, 376, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106 (1996).
*45 In State v. Taylor, the Louisiana Supreme Court acknowledged that the trial court's refusal to allow defendant to exercise remaining peremptory challenges immediately before the jury panel was sworn violates the law as interpreted in Watts. However, the court held that under the circumstances of that case, the error was harmless. The court reviewed the voir dire and determined that the trial court cured the initial confusion on the backstrike issue by allowing defendant "a provisional sort of `backstrike' after it failed to exercise any peremptory challenges on the first panel." State v. Taylor, 93-2201 at pp. 24-25, 669 So.2d at 377. Taylor specifically argued how he was prejudiced. Nevertheless, the Supreme Court found no merit in defendant's claims of prejudice. The Supreme Court also noted that defendant failed to exhaust all of his peremptory challenges and that the refusal to allow backstrike did not prevent the defendant from utilizing all of his challenges during the jury selection process.
During challenges of the first panel, defense counsel inquired if he could backstrike. He did not request that he be allowed to backstrike any particular prospective juror. The trial court denied the request. At that time, defense counsel made no objection to the trial court's ruling. It was not until all the challenges had been made on the second panel and all the jurors, except alternate jurors, had been accepted, that defense counsel objected to the earlier ruling of the trial court. Again, at that time, defense counsel did not request a backstrike of any particular juror. The entire panel was sworn after the alternates were accepted.
In light of Watts and Taylor, the trial court's ruling was erroneous. Nevertheless, we find that the error was harmless. At trial, defendant not only did not seek to challenge any particular juror using a backstrike, he did not object and argue a basis for why backstrikes should be allowed at the time of the ruling. Additionally, defendant does not allege on appeal any prejudice that may have occurred to him. The verdict actually rendered in this case "was surely unattributable to the error." State v. Ellis, 99-0425 at p. 5, 756 So.2d at 421.

EXCESSIVE SENTENCE
In assignment of error number four, defendant contends that the imposed statutorily mandated sentence, life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence, is excessive. While he acknowledges that life sentences for second degree murder, even for a juvenile, have not been found to be excessive, he argues that his age at the time of the offense (fifteen years) warrants a remand for resentencing. The state argues that life imprisonment is the only sentence allowed by statute and, therefore, is not excessive.
Article I, Section 20, of the Louisiana Constitution of 1974 prohibits the imposition of excessive punishment. Although a sentence may be within statutory limits, it may violate a defendant's constitutional right against excessive punishment and is subject to appellate review. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). Generally, a sentence is considered excessive if it is nothing more than the needless imposition of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm to society, it is so disproportionate as to shock one's sense of justice. State v. Reed, 409 So.2d 266, 267 (La.1982). A trial judge is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed should not be set aside as excessive in the absence of *46 manifest abuse of discretion. State v. Lanclos, 419 So.2d 475, 478 (La.1982).
At the sentencing, the trial court stated that although it was "supposed to review the sentencing guidelines" in La.Code Crim.P. art. 894.1, that act would not be "meaningful" because the sentence is statutorily mandated and the court was without discretion. Nor was a pre-sentence investigation ordered in this matter.
Although the sentence is mandatory, the trial court should conduct a review of the sentence for constitutional infirmity. However, in this particular case, defendant has failed to show that, because of some unusual circumstances, he did not receive a sentence tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case. Rather, the testimony of the psychiatrists indicates that although defendant may have received some mental health evaluations and had been diagnosed with depression, he had not reported having delusions or hallucinations before the shooting. He knew right from wrong. Although defendant was only fifteen at the time of the offense and sixteen at the time of sentencing, he has also failed to show how his youth justified a deviation from the mandatory sentence. See State v. Henderson, 99-1945, pp. 18-20 (La.App. 1 Cir. 6/23/00), 762 So.2d 747, 760-761, writ denied, 2000-2223 (La.6/15/01), 793 So.2d 1235. In summary, defendant presented no particular facts regarding his family history, or special circumstances of his life, that would support a deviation from the mandatory sentence provided in La.R.S. 14:30.1 B. Therefore, defendant's sentence is not excessive.
CONVICTION AND SENTENCE AFFIRMED.
GUIDRY, J., concurs and assigns reasons.
FITZSIMMONS, J., writes specially to agree with the reasons assigned by GUIDRY, J.
GUIDRY, J., concurring.
The majority correctly finds the prosecutor's impermissible references to defendant's choice to remain silent were a violation of defendant's constitutional right against self incrimination. However, based on the long-standing jurisprudential doctrine of harmless error, espoused in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and its progeny, the majority finds this error was harmless, because after considering the evidence, the guilty verdict was not attributable to the erroneous references. While I agree with the majority that application of the harmless error doctrine to the facts of this case results in a finding that the error was harmless, I concur to express my disagreement with the harmless error doctrine, which I find to be unworkable.
I do not believe such a serious infraction of a defendant's constitutional rights should be brushed aside as mere harmless error. The United States Supreme Court has already stated that silence in the wake of Miranda warnings may be nothing more than the arrestee's exercise of his Miranda rights, and that it is "fundamentally unfair and a deprivation of due process" to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. See Doyle v. Ohio, 426 U.S. 610, 617-18, 96 S.Ct. 2240, 2244-45, 49 L.Ed.2d 91 (1976). The prosecutor in this case did just that: he attempted to impeach defendant's exculpatory version of events (i.e., that Jeremy was the shooter and he (defendant) was framed), told for the first time at trial, by cross-examining him, and in closing, emphasizing the fact of defendant's failure to have told the story after receiving Miranda *47 warnings at the time of his arrest. It is obvious that the prosecutor's line of questioning, and particularly his remarks during closing argument, were not merely oblique references to the defendant's post-arrest silence; rather, the prosecutor was clearly attempting to impeach defendant's credibility with his post-arrest silence. This is precisely the type of questioning forbidden by Doyle and its progeny. See State v. Sam, 412 So.2d 1082 (La.1982); State v. Grant, 99-1065, p. 8 (La.App. 5 Cir. 1/25/00), 761 So.2d 10, 14.
The test for determining whether an error is harmless is whether the verdict actually rendered in this case "was surely unattributable to the error." Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993); State v. Ellis, 99-0425, p. 5 (La.App. 1 Cir. 12/28/99), 756 So.2d 418, 421. The harmless error analysis begins with the premise that the evidence is otherwise sufficient to sustain the conviction if viewed from the perspective of a rational factfinder and asks whether beyond a reasonable doubt the error could not have contributed to the verdict actually returned by the defendant's jury. State v. Haddad, 99-1272, p. 9 (La.2/29/00), 767 So.2d 682, 689. In other words, it must be established beyond a reasonable doubt that the guilty verdict was surely unattributable to the error in order to find that it was harmless.
The inquiry is not whether the error did in fact sway the jury's determination, but whether there is a reasonable possibility that the error contributed to the jury's decision. If there is a reasonable possibility that the evidence complained of contributed to the verdict, then it can hardly be concluded beyond a reasonable doubt that the error was harmless. State v. Lee, 524 So.2d 1176, 1191 (La.1987) (on rehearing). To reach this determination, we say we apply an objective test and whether such a possibility exists "is a question of law to which our appellate jurisdiction extends." State v. Gibson, 391 So.2d 421, 427 (La.1980). However, in actuality, we are determining whether a guilty verdict would surely not have been different absent the constitutional error. This requires us to engage in pure speculation: what was the reasonable juror thinking when he/she made his/her decision, and did the reasonable juror base his/her decision in any way on the error? I do not believe this can be done, much as a bell which has rung cannot be "unrung". What we are actually doing, whether we admit it or not, is putting ourselves into the position of a reasonable juror and determining the defendant's guilt; clearly this is an abuse of appellate review. The Constitution requires more than appellate speculation about a hypothetical jury's actions. See Sullivan, 508 U.S. at 280, 113 S.Ct. at 2082; State v. Gibson, 391 So.2d 421, 427 (La.1980).
Thus, application of the harmless error test requires this court, in exercising its appellate jurisdiction, to substitute for the verdict its judgment of what the jury would or should have decided in the absence of error. Because there is no other feasible way to determine the impact of such an error on the jury's verdict, I believe such errors should be reversible as a matter of law. Because I am constrained by the law as it exists, I concur with the majority.