MICHAEL E. KIRBY, Judge.
 

 ^¡STATEMENT OF CASE
 

 On November 25, 2003, the State charged Romallis Stukes with two counts of attempted second degree murder. He pled not guilty to both counts at his arraignment on December 2. On October 25, 2004, a jury found him guilty of two counts of aggravated battery. At sentencing on January 21, 2005 Stukes filed a motion for new trial and for post verdict judgment of acquittal. On February 18 the court denied the motion for post verdict judgment of acquittal but granted the motion for new trial. The State sought relief in this court, which this court granted in a disposition.
 
 State v. Stukes,
 
 unpub. 2005-0892 (La.App. 4 Cir. 3/22/06). The defense sought writs in the Supreme Court from this court’s ruling. In the meantime, the court below sentenced Stukes on May 11, 2006 to serve ten years at hard labor on each count, to run concurrently.
 
 [1]
 
 The trial court also denied the defendant’s motion to reconsider the sentences and granted his motion for appeal. Subsequently, the Supreme Court granted relief on the defendant’s writ application, remanding the case to this court for briefing, argument, and opinion.
 
 State v. Stukes,
 
 2006-0766 (La.6/30/06), 933 So.2d 131. On remand, this court again granted writs, reversed the trial court’s ruling, reimposed the convictions, and remanded the case.
 
 State v. Stukes,
 
 2005-0892 (La.App. 4 Cir. 10/25/06), 944 So.2d 679. The Supreme Court denied the defendant’s writ from this ruling.
 
 State v. Stukes,
 
 2006-2654 (La.6/29/07), 959 So.2d 518.
 

 On remand, the trial court discovered in July 2008 that it had already granted Stukes’ appeal in 2006.
 

 FACTS
 

 The following fact summary is taken from this court’s opinion in the 2005 writ:
 

 Joy Lewis testified that she, her cousin Bruce Salvant, Jr., and a friend Greg Gaines attended a Saints game on September 28, 2003. After the game, they agreed to meet at Club 30 Something. Ms. Lewis testified that she parked her car behind the club, and after she walked to the front of the club she saw the defendant Romallis Stukes standing in front talking with her cousin Ashley. Ms. Lewis stated that because she could see Salvant and Gaines waiting for her near the doorway, she merely said hello to Ashley and Stukes as she passed by them. She stated that she did not personally know Stukes, but she recognized him because he had visited a bar where she worked. She testified that after she
 
 *1236
 
 had passed him, Stukes began calling to her, and then called her names when she would not respond to him. She stated that she continued walking toward Sal-vant (who was on his cell phone) and Gaines, and when she reached Gaines, Stukes told Gaines to get her attention. Ms. Lewis testified that Gaines told Stukes he would not do so because Stukes had been “disrespecting” her. This led to an exchange of words between Stukes and Gaines.
 

 Ms. Lewis stated that when Salvant finished his phone conversation, she and Salvant started to walk into the club, while Gaines and Stukes continued to exchange words. Ms. Lewis testified that she heard Stukes say, “I got something for y’all.” At that point, she saw another [sman give Stukes the key to a nearby car. Stukes went to the car and returned with a gun in his hand. Ms. Lewis testified that she heard at least two shots and saw Salvant fall to the ground. She and Gaines ran inside the club, and at that point she noticed that Gaines had also been shot. She testified that her brothers were inside the club, and she told them that Salvant had been shot. They went back outside, and she called the police, giving them Stukes’ description as well as the descriptions and license plate numbers of his car and the car next to his.
 

 Ms. Lewis denied brandishing a weapon at Stukes, and she insisted that Gaines was not armed that night, explaining that Gaines had gone through a metal detector at the game earlier that evening. Ms. Lewis testified that sometime later she viewed a photographic lineup at the Seventh District police station from which she chose the photo of Stukes as the man she saw shoot Sal-vant. She also positively identified Stukes at trial.
 

 Ms. Lewis admitted that Gaines and Stukes exchanged words prior to the shooting, but she testified that the exchange was not “heated.” She also testified that Salvant was not involved in the argument at all. She insisted that no one had threatened Stukes prior to the shooting. She testified that she had consumed one alcoholic beverage prior to going to the Saints game, but she denied drinking anything at the game.
 

 Greg Gaines testified he attended the Saints game with the Lewis/Salvant family. He stated that after the game, he went to Club 30 Something with James and Ryan Lewis, Joy’s brothers. He stated that when they arrived at the club, he looked inside briefly and then waited outside for Ms. Lewis to arrive. He testified that when he noticed her walking up to the club, she passed by Stukes. Gaines testified that he heard Stukes say something rude to Ms. Lewis, which she ignored, but Stukes continued to harass her. Gaines stated that when Ms. Lewis approached him, Stukes asked him to get her attention. He refused, and the two men exchanged words. Ms. Lewis indicated she wanted to go inside, and as they turned to go Stukes told them he had something for them. Gaines testified that Stukes went to a nearby car, got a gun, and began firing at them. Gaines stated that he heard two shots, one of which hit him. He stated that he stumbled inside the club and collapsed. He testified he did not know Salvant had been shot until emergency workers removed him from the club later that night. He [4positively identified Stukes at trial as the man who shot him.
 

 Gaines denied having a weapon that night, pretending he had a weapon, or threatening Stukes. On cross-examination, he denied telling the police he heard only one shot. He stated that he
 
 *1237
 
 saw Stakes shooting at him and his companions, but he did not actually see where the bullets went. He testified that he had consumed three beers at the game, but he was not intoxicated at the time of the shooting. He also denied that the verbal exchange between him and Stakes was heated.
 

 Dr. Michael Grieb, who was qualified as an expert in the field of emergency medicine, testified that he treated Gaines at Methodist Hospital on the night of the shooting. He testified that Gaines sustained a gunshot wound to his left arm, which missed his chest. Dr. Grieb testified that at the hospital Gaines told him he heard one shot.
 

 Dr. John Hunt, III, qualified as an expert in surgery, testified that he treated Salvant at Charity Hospital on the night of the shooting. Dr. Hunt testified that Salvant sustained a “through and through” gunshot wound to his neck; no pellet was recovered. Det. Hunt testified that this wound also damaged Salvant’s spine, rendering him a quadriplegic.
 

 Lloyd Goeloe testified that he worked as a deejay at the club on the night of the shooting. He stated that as he parked his car in front of the club to unload his equipment, he saw Stakes talking with a few men. Goeloe testified that after depositing his equipment inside, he went back outside to move his car. He saw Ms. Lewis and Gaines, whom he greeted, and he continued to his car. He testified he heard the conversation between Gaines and Stakes, which escalated as he walked to his car. Goeloe testified that he could see that the conversation would not end well, and he walked up to Stakes to try to get him to go inside the club. Instead, Stakes continued arguing with Gaines. Goeloe stated that Stakes then said he was going to get his gun, and he went toward a nearby car. Goeloe testified he looked around for the security guard, but he did not see one; instead, he sent another worker inside to look for the guard. Goeloe stated that he followed Stakes to the car, bumping into him at one point, and he saw Stakes open the car door and remove a gun. Goeloe testified that he tried to | ¡^dissuade Stakes from using the gun, but Stakes walked away from him. Goeloe testified that Stakes walked toward Gaines, pointed the gun at Gaines, and fired. Goeloe testified that the bullet hit Sal-vant and then hit Gaines. Goeloe testified that Salvant fell to the ground, and Stakes jumped back. Goeloe testified he went to Salvant to try to staunch his bleeding. Goeloe insisted he saw no one else shooting that night.
 

 Marsha Thompson testified that she was working as a bartender at the club that night. She testified that at some point someone came into the club and told her that Bruce and Greg had been shot outside. At that point, Gaines walked inside, and Ms. Thompson could see that he was bleeding on the left side of his body. She took Gaines’ shirt off of his body and noticed the gunshot wound in his arm. She used his belt as a tourniquet on his arm and eventually went with him to Methodist Hospital. Ms. Thompson testified that she did not notice any weapons in Gaines’ possession when she removed his shirt, nor did she find any weapons in her car after she had dropped him off at the hospital.
 

 Ryan Lewis stated that he is Ms. Lewis’ brother and Salvant’s cousin. He testified that he, his brother, Gaines, and Salvant arrived at the club that night after leaving the Saints game. He stated that he and his brother went inside the club while Gaines remained outside. Lewis admitted that he and
 
 *1238
 
 Gaines had been drinking at the game, but he indicated that Salvant only had one beer. Lewis testified that he heard two shots, and then Ms. Lewis came into the club and told him that Salvant had been shot. He testified he looked out the door and saw a man dressed in a white jumpsuit with blue trim (which the other witnesses testified Stakes was wearing). Lewis testified he walked outside, grabbed a stanchion from the parking lot, and threw it at the man in the jumpsuit, who was walking toward a car. Lewis testified he also picked up a traffic cone and threw it at the man. Lewis stated that as the man got on the other side of a truck, he raised his hand, which contained a gun. Lewis then ducked down, and the man got in a car and drove away. Lewis denied having any weapons that night.
 

 James Lewis, IV testified that he, his brother Ryan, his cousin Salvant, and Gaines left the game and went to the club. He testified that he went inside once they arrived, and soon thereafter he heard two gunshots coming from outside. He testified he went outside and hsaw Salvant lying on the ground bleeding. He stated his brother Ryan then began throwing a traffic cone at a man in a white jumpsuit, and that man pointed a gun at Ryan. James testified that Ryan ducked down behind a car, and the man then tried to point the gun at Ryan over the top of the car. James stated that he caught the man’s attention, and the man then pointed the gun at him. James hid behind some people standing outside, and the man again pointed the gun at Ryan. James insisted he did not have a weapon that night, but he could not say if Gaines had one.
 

 Det. Gregory Powell stated that he investigated the shootings. He testified officers seized one pellet and one spent casing outside Club 30 Something on Downman Road. He testified that from speaking with witnesses, he developed Stakes as a suspect in the shooting. Det. Powell stated that he later showed a photographic lineup to Salvant while Salvant was in the hospital, and Salvant chose Stakes’ photo as depicting the man who shot him. Det. Powell stated that Salvant’s mother signed the back of the lineup for him because of Salvant’s paralysis. Det. Powell also showed Ms. Lewis a lineup from which she chose Stakes’ photo. Det. Powell testified that he learned that Stakes had surrendered at the Seventh District police station, and he met Stakes there and took his statement. Det. Powell testified that after being advised of his rights, Stakes stated that he was verbally playing with Ms. Lewis when two men became enraged. He testified they exchanged words, and the taller of the two men responded, “You can’t handle this.” The man then reached under his shirt. Stakes told Det. Powell that because he believed the man was reaching for a gun, he reached under his shirt, pulled his own gun, and fired at the taller man. At that moment, the shorter man moved and was hit by the bullet. Stakes then told Det. Powell that he threw the gun out the window of his car while driving over the high-rise bridge over the Industrial Canal, and he disposed of his clothing in Metairie. Det. Powell arrested Stakes for the shooting. He stated that although officers searched the area under the bridge where Stakes said he threw the gun, they were unable to find it. He also stated that Stakes told him that he threw away the gun and his clothing because he was scared.
 

 On cross-examination, Det. Powell estimated that he arrived at the scene of the shooting approximately seven minutes after it was reported to the police.
 
 *1239
 
 He testified that both Lewis brothers stated they were inside the club |7when the shooting occurred, and they went outside and found their sister hysterical and their cousin shot. Det. Powell testified that the brothers told him that they saw Stakes gét into a car and drive away. Det. Powell admitted that his report did not indicate that either brother told him that Stakes pointed a gun at them, but he insisted that one of the brothers told him this occurred, and he did not put this fact into the report. He also testified that Gaines told him that he heard only one shot. There was also some indication that Det. Powell testified at an earlier hearing that the Lewis brothers mentioned that they heard one shot. Det. Powell admitted that the officers found only one pellet and one casing at the scene.
 

 Off. Keiondra Morgan testified that she responded to the call of the shooting and found two victims suffering from gunshot wounds. She testified that the officers seized one spent casing and one pellet, but they found no weapons. Off. Morgan testified that she interviewed Gaines while he was awaiting treatment at the hospital, and Gaines told her that he and Stakes became embroiled in a verbal altercation which led to the shooting. She testified that Gaines told her that Stakes fired one shot.
 

 The State’s final witness was Bruce Salvant, Jr., who testified that he arrived at the club with Gaines and two Lewis brothers. He testified that he looked inside the club and then remained outside, calling Ms. Lewis to see if she would be joining them. Salvant stated that he was talking to someone else on his cell phone when he noticed Ms. Lewis walking up to the club. He testified that he saw Stakes, Ms. Lewis, and Gaines in a verbal confrontation, but he was not involved in the conversation. He testified that Stakes, whom he had never met before that night, was trying to get Ms. Lewis to come to him, but she refused to do so, and Gaines took exception to Stakes’ foul language. Salvant testified he walked up to Ms. Lewis and Gaines and attempted to get them inside the club. Salvant stated that as they walked to the door, he heard someone say: “Hand me the keys. I got something for them.” Salvant testified he looked back and saw Stakes pointing a gun at him. Stakes then shot him. Sal-vant stated that he heard his cousin call out a license plate number, and his cousin stayed with him, trying to keep him awake while awaiting medical help. Sal-vant testified he later viewed a photographic lineup while in the hospital and positively identified Stakes as the man who shot him. On cross-examination, Salvant ^testified that he was standing between Stakes and Gaines when Stakes fired at him.
 

 The defense presented various witnesses who were at the club on the night of the shooting. Joseph Alexander testified he was outside the club and saw Stakes arguing with another man who was standing by the door. Alexander stated that he saw the other man reach under his shirt, and he could see an object with a chrome handle under the man’s shirt. Alexander testified he believed the object was a gun, and he ran from the area. Although he did not see the shooting, he testified he heard one shot. He denied that anyone else spoke with Stakes during the argument. Alexander stated that he knew Stakes from working with him in the past.
 

 Danielle Lumar was also standing outside the club just prior to the shooting. She stated that she saw two men, one of them Stakes, arguing. Although she did not know the content of the argument,
 
 *1240
 
 she testified she heard Stakes shout, “if you’re going to shoot me, shoot me.” At that point, she saw the other man reach under his shirt, and she saw a silver object under the man’s shirt. Ms. Lu-mar testified the man turned, and then she heard a shot. She then left the area. Ms. Lumar testified that she had never seen Stakes before that night.
 

 Stella Knight testified that she was inside the club at the time of the shooting. She testified that right after the shooting a man hurried into the club and handed a silver gun to somebody standing by the door. She testified that she then left the bar, but these men remained inside the club. Ms. Knight admitted that she recognized Stakes, but she did not really know him.
 

 Rene Stakes, the defendant’s wife, testified she was not at the club on the night of the shooting. She testified that her husband told her what happened at the club, but due to the State’s objection she did not specify what he told her.
 

 Roman Colwart, who admitted he was some relation to Stakes, testified that he was present at the club several weeks prior to the shooting. Colwart stated that on that occasion, Stakes was forcibly removed from the club after having an altercation with a group of people when Stakes was accused of touching someone. Colwart testified that Gaines was one of the people with whom Stakes had been arguing. Colwart testified that after | flStukes was ejected from the club, someone told him: “Do you know where you’re at, you’re in front of Club Thirty [Something. You’ll get killed out here.”
 

 Colwart stated that he was not present on the night of the shooting, but soon thereafter Stakes called to tell him that he had shot someone at the club who had pulled a gun on him. Colwart then drove Stakes to the police station where Stakes surrendered.
 

 Romallis Stakes maintained that he did not intend to harm Salvant or Gaines and that he merely fired in self-defense. He testified that a few weeks prior to the shooting, he was at Club 30 Something when a group of people, which included Gaines, accused him of touching people in the group. Stakes stated that the group removed him from the club, despite his protests of innocence, and people standing outside the club warned him they would kill him. He testified that Colwart, who was also there, convinced him just to leave the club. He testified his cousin Lamont was also present, but by the time of trial Lamont was deceased.
 

 Stakes testified that on the night of the shooting he was standing outside the club with Lamont when Ms. Lewis passed them on her way into the club. Stakes stated that he was acquainted with Ms. Lewis because he and his wife frequented the bar where she worked. Stakes testified that as Ms. Lewis passed him, he said hello, but she just ignored him. He then playfully called her “Big Head,” but she continued to ignore him. She walked over to Gaines, who was standing by the door, and he called to Gaines to get Ms. Lewis’ attention. Gaines refused, indicating that Stakes had “disrespected” her. They argued about this, and then Ms. Lewis opened the door to go into the club. Stakes stated that Gaines then warned him that they were going to kill him. Stakes testified that he responded that if Gaines was going to shoot him, he should just do so, and he opened his arms. At that point, Gaines turned and reached under his shirt to show Stakes his gun. Stakes testified he drew his own gun and shot at Gaines. He then jumped to the side of a van, and when
 
 *1241
 
 he looked back at the club, he did not see Gaines but instead a man came running out of the club and threw a traffic cone at him. Stukes insisted he only fired his gun once, and he denied exchanging any words with Salvant. Stukes testified that he got into his car and drove from the club. He testified he panicked and threw his gun out of the window of his car as he crossed the Industrial | inCanaI. He testified he changed his clothes and disposed of them somewhere in Metairie. He then called his wife and his cousin, and the cousin took him to the police station where he surrendered.
 

 Stukes insisted that he only fired in self-defense because he believed Gaines was going to shoot him. He also testified that a civil suit was pending against him in connection with the shooting.
 

 On cross-examination, Stukes denied calling Ms. Lewis obscene names. He also denied that Mr. [Goeloe] tried to intervene in the argument. He denied going to his car to get his gun, maintaining that he was carrying the gun at the time. He insisted that Gaines was carrying a gun at the time he shot at Gaines. He admitted, however, that no one returned his fire.
 

 On rebuttal, the State called Antoine Dupre, who testified he is a close family friend of Salvant, and he knows Gaines. Dupre testified that that a few weeks prior to the shooting, he was with a group of men and women at the club. As they exited the club, Stukes approached the group and made improper remarks to one of the women. A man in the group took exception, and Stukes and the man argued. The argument became heated, and Dupre had to separate Stukes and Dupre’s friend. Dupre testified that Stukes tried to continue the argument, and again Dupre separated the two. Dupre denied that Gaines was present that night, and he further denied that anyone in the group threatened Stukes. He testified that other than him, the rest of the group was not connected to Salvant. He also testified that although there were two security guards present that night, neither became involved in the incident.
 

 State v. Stukes,
 
 2005-0892, pp. 2-12, 944 So.2d at 681-686.
 

 DISCUSSION
 

 Errors Patent
 

 A review of the record indicates that the copy of the bill of information contained in the record before this court does not contain the signature of the assistant district attorney who filed the bill. A review of the district court record | nshows that it also does not contain a signed copy of the bill. A bill of information is “a written accusation of a crime made by the district attorney ... and signed by him.” La.C.Cr.P. art. 384 In State
 
 v. White,
 
 404 So.2d 1202 (La.1981), the Court held that the failure to show that the bill of information was signed was not fatal to the jury’s verdict because the State’s active prosecution of the case dispelled any doubts about the authenticity of the bill itself. The Court also noted that although La.C.Cr.P. art 535 provides that the failure of the district attorney to sign a bill of information would be a basis for a motion to quash the bill, the defendant’s failure to file a motion to quash on this ground waived any error from this omission. See also
 
 State v. Allen,
 
 2005-1622 (La.App. 1 Cir. 3/29/06), 934 So.2d 146. Here, the appellant did not file a motion to quash the bill of information on this ground, and the State’s active prosecution of the case showed that the district attorney fully ratified the filing of the bill of information. Therefore, the fail
 
 *1242
 
 ure of the present record to contain a signed bill of information is harmless.
 

 There are no other patent errors.
 

 Assignments of Error
 

 I.
 

 By his third assignment of error, the appellant contends that there was insufficient evidence to support his conviction. By part of his fourth assignment, he argues that the trial court erred by denying his motion for new trial based in part upon his claim that the verdict was contrary to the evidence adduced at trial. | ^Specifically, he asserts that the State failed to show that the shootings were not committed in self defense.
 
 [2]
 

 The Louisiana Supreme Court set forth the standard for evaluating a claim of insufficient evidence in
 
 State v. Brown,
 
 2003-0897, p. 22 (La.4/12/05), 907 So.2d 1, 18:
 

 When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated in
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under this standard, the appellate court “must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.”
 
 State v. Neal,
 
 00-0674, (La.6/29/01) 796 So.2d 649, 657 (citing
 
 State v. Captville,
 
 448 So.2d 676, 678 (La.1984)).
 

 When circumstantial evidence is used to prove the commission of the offense, La. R.S. 15:438 requires that “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.”
 
 Neal,
 
 796 So.2d at 657. Ultimately, all evidence, both direct and circumstantial must be sufficient under Jackson to prove guilt beyond a reasonable doubt to a rational jury. Id. (citing
 
 State v. Rosiere,
 
 488 So.2d 965, 968 (La.1986)).
 

 See also
 
 State v. Batiste,
 
 2006-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810;
 
 State v. Sykes,
 
 2004-1199 (La.App. 4 Cir. 3/9/05), 900 So.2d 156.
 

 Although the appellant was charged with two counts of attempted second degree murder, the jury returned two verdicts of aggravated battery. The elements of aggravated battery were discussed by this court in
 
 State v. Wix,
 
 2002-1493, p. 10 (La.App. 4 Cir. 1/15/03), 838 So.2d 41, 47:
 

 11PLa, R.S. 14:34 defines aggravated battery as a battery committed with a dangerous weapon. La. R.S. 14:33 defines a battery as the intentional use of force or violence upon the person of another or the intentional administration of a poison or other noxious liquid or substance to another.
 

 Aggravated battery is a crime of general intent, meaning that the State need only prove the offender must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act.
 
 State of Louisiana in the Interest of H.L.F. and R.J. T.,
 
 97-2651, p. 3 (La.App. 4 Cir. 5/20/98), 713 So.2d 810, 812.
 

 To support a conviction of aggravated battery the State has the burden to prove three elements: (1) that the de
 
 *1243
 
 fendant intentionally used force or violence against the victim, (2) that the force or violence was inflicted with a dangerous weapon, and (3) that the dangerous weapon was used in a manner likely to cause death or great bodily harm.
 
 State v. Rainey,
 
 98-436 (La.App. 5 Cir. 11/25/98), 722 So.2d 1097, 1102.
 

 Here, the appellant was convicted of shooting both Mr. Gaines and Mr. Salvant. He acknowledges that he shot the men, but he insists that the State failed to negate his claim that the shooting occurred in self-defense. La. R.S. 14:18 sets forth the defense of justification:
 

 The fact that an offender’s conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct. This defense of justification can be claimed under the following circumstances:
 

 * ⅜ *
 

 (7) When the offender’s conduct is in defense of persons or property under any of the circumstances described in Articles 19 through 22.
 

 In addition, La. R.S. 14:19 provides:
 

 The use of force or violence upon the person of another is justifiable, when committed for the purpose of preventing a forcible offense against the person or a |14forcibIe offense or trespass against property in a person’s lawful possession; provided that the force or violence used must be reasonable and apparently necessary to prevent such offense, and that this article shall not apply where the force or violence results in a homicide.
 

 In
 
 State v. Woods,
 
 on rehearing 2000-2712, p. 2 (La.App. 4 Cir. 9/11/02), 828 So.2d 6, 15, this court addressed the doctrine of self-defense:
 

 As noted by this court in
 
 State v. Fluker,
 
 618 So.2d 459, 462 (La.App. 4 Cir.1993): “In a non-homicide situation, the defense of justification requires a dual inquiry, namely: an objective inquiry into whether the force used was reasonable under the circumstances; and, a subjective inquiry into whether the force was apparently necessary.” See also
 
 State v. Freeman,
 
 427 So.2d 1161 (La.1983);
 
 State v. Sparrow,
 
 612 So.2d 191 (La.App. 4 Cir.1992). In
 
 Fluker,
 
 this court also held that the State has the burden of proving a lack of justification in a non-homicide case, just as it does in a homicide case.
 
 Fluker
 
 at 463.
 
 [3]
 
 See also
 
 State v. Smith,
 
 2000-0523 (La.App. 4 Cir. 12/20/00), 777 So.2d 584.
 

 See also
 
 State v. Jefferson,
 
 2004-1960 (La.App. 4 Cir. 12/21/05), 922 So.2d 577. But see
 
 State v. Wischer,
 
 2004-0325 (La.App. 4 Cir. 9/22/04), 885 So.2d 602, where a divided panel of this court held that in a non-homicide case the
 
 defendant
 
 has the burden of showing by a preponderance of the
 
 *1244
 
 evidence that the crime was committed in self-defense.
 

 Here, the appellant argues that the State’s evidence does not negate his claim that he shot Mr. Gaines and Mr. Salvant in self-defense. He cites to inconsistencies in the testimony of the State’s witnesses as to whether he and Mr. [1BGaines were arguing prior to the shooting and as to how many shots the witnesses heard. He also points to testimony by his witnesses to the effect that Mr. Gaines had a gun. He finally points to testimony concerning a prior incident at the same club wherein a group of people (including Mr. Gaines) threatened to kill him.
 

 Under either standard set forth above, the evidence was sufficient to negate the self-defense claim. Despite the fact that Ms. Lewis and Mr. Gaines testified that they heard two shots, while other witnesses testified that they heard only one, the shooting of both men was explained by Mr. Goeloe, the DJ at the club, who testified that he saw Mr. Salvant walk in front of Mr. Gaines just as the appellant fired. He testified that the bullet passed through Mr. Salvant and hit Mr. Gaines.
 

 Mr. Goeloe further testified that he saw the argument between Mr. Gaines and the appellant. Contradicting the appellant’s later testimony, Mr. Goeloe testified that he saw the appellant go to a car and retrieve a gun. Mr. Goeloe testified that he tried to dissuade the appellant from taking any further action, but the appellant brushed past him and fired at Mr. Gaines, hitting Mr. Salvant and then Mr. Gaines.
 

 With respect to whether Mr. Gaines was armed, the appellant presented two witnesses, one of whom was a former coworker, who testified that they saw Mr. Gaines reach under his shirt and reveal a silver or chrome object before the appellant pulled a gun and shot him. However, Mr. Goeloe discounted this version of the events, and he further testified that he did not see anyone else with a gun that night. In addition the appellant presented another witness who testified that she saw someone come into the club after the shooting and hand someone else inside the club a gun. By contrast, the bartender of the club testified that when she removed Mr. Gaines’ shirt to tend his wounds, he did not have a gun.
 

 |1fiAs for the prior incident at the club, both the appellant and Mr. Colwart, a relative, testified that some weeks before the shooting, the appellant was in the same club and got into an altercation with a group of people that included Mr. Gaines over the appellant’s supposed touching of a woman in the group. Both Mr. Colwart and the appellant testified that after the appellant was thrown out of the club, someone told him that he would be killed at the club. However, on rebuttal the State presented Mr. Dupre, who testified that on that night Mr. Gaines was not present (Mr. Salvant was), and that he twice had to separate the appellant and another man who were arguing about the incident. Mr. Dupre denied that anyone threatened the appellant that night.
 

 The jury was aware of the various inconsistencies and the differing versions offered by the State and the defense as to what led to the shooting, and the jury apparently chose to believe the testimony of the State’s witnesses over that of the defense. This court has repeatedly held that a factfinder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence.
 
 State v. Huckabay,
 
 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093;
 
 State v. Harris,
 
 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. Given the testimony in this case, the jury did not abuse its discretion by crediting the testimony of the State’s witnesses as to what
 
 *1245
 
 happened prior to the shooting. Thus, under either standard set forth above, there was sufficient evidence for the jury to negate the appellant's claim of self-defense and to find him guilty beyond a reasonable doubt of aggravated battery in the shootings of Mr. Gaines and Mr. Sal-vant. His assignments of error three and four, as four relates to the sufficiency of evidence, have no merit.
 

 Jbn-
 

 By his first assignment of error, the appellant contends that the trial court committed reversible error by denying either side the opportunity to “backstrike” any juror that had been accepted. By his second assignment, he contends that this problem was exacerbated by the disappearance of a venire member prior to the jury’s selection. By his fourth assignment, he asserts that the trial court erred by denying his motion for new trial based in part upon these claims.
 

 In connection with these assignments of error, this court attempted to obtain the transcript of voir dire, but received a certification from the court reporter that this transcript is no longer available. In a supplemental brief appellant alleges that his right to a full appeal has been denied because the transcript of voir dire is no longer available. We find that the record is sufficient to determine the merits of his claim even in the absence of the voir dire transcript.
 

 All parties agree that prior to the beginning of voir dire, the trial court indicated that it would not let either of the parties backstrike any juror who had initially been accepted. While the State now contends that there is no showing that the appellant objected to the court’s ruling disallowing backstrikes, the appellant contends that he objected. The affidavit from the A.D.A. who prosecuted the case, which the appellant attached to his supplemental brief, also indicates that the appellant did object to the court’s ruling. In its reply to the supplemental brief the State argues that the attachments to the supplemental brief should not be considered because they were not contained in the record before this court, and the appellant has not formally moved to supplement the record with them.
 

 Even ignoring the affidavit, we conclude that the defense objected to the court’s ruling on backstrikes. In its response to the motion for new trial, filed by |isthe A.D.A. who prosecuted the case, there is no argument that the defendant did not contemporaneously object to the court’s ruling; the argument advanced by the state was that the motion for new trial should have been denied because the defense did not move to backstrike any sworn juror, give any reason why it would have backstruck a juror, or indicate what juror it would have backstruck. Surely had there been no contemporaneous objection to the ruling that disallowed back-striking it would have been urged at that time.
 

 Baekstriking of jurors is authorized by La.C.Cr.P. art. 799.1, which provides:
 

 Notwithstanding any other provision of law to the contrary, and specifically notwithstanding the provisions of Article 788, in the jury selection process, the state and the defendant may exercise all peremptory challenges available to each side, respectively, prior to the full complement of jurors being seated and before being sworn in by the court, and the state or the defendant may exercise any remaining peremptory challenge to one or more of the jurors previously accepted. No juror shall be sworn in until both parties agree on the jury composition or have exercised all challenges
 
 *1246
 
 available to them, unless otherwise agreed to by the parties.
 

 This article was added in 2006 to codify the holding of earlier cases that recognized a party’s right to backstriking. See
 
 State v. Taylor,
 
 93-2201 (La.2/28/96), 669 So.2d 364;
 
 State v. Watts,
 
 579 So.2d 931 (La.1991);
 
 State v. Hailey,
 
 2002-1738 (La.App. 4 Cir. 9/17/03), 863 So.2d 564. Courts have routinely held that the failure to allow a party to backstrike is error, but such error is subject to a harmless error test. Taylor;
 
 Hailey; State v. Plaisance,
 
 2000-1858 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172.
 

 In
 
 Taylor,
 
 the Court agreed that the trial court erred by failing to allow the defendant to exercise backstrikes of accepted jurors. The Court nonetheless found 11flthat such error was harmless, given the fact that the voir dire transcript showed that counsel had a full opportunity to examine and challenge any potential jurors. This court likewise found in
 
 Plai-sance,
 
 noting that defense counsel had a full opportunity to examine the potential jurors and that the defendant did not specify whom he would have backstruck had he been given the chance. In Hailey,' although the defendant objected at trial to the prohibition on backstriking, he did not specify whom he would have backstruck. At the hearing on his motion for new trial he listed three jurors he would have struck, giving reasons for only two. This court noted:
 

 In the instant case, just as in
 
 [State v.]Crotwell,
 
 [2000-2551 (La.App. 1 Cir. 11/9/01), 818 So.2d 34], defense counsel did not, at any point during the jury selection process or at the conclusion thereof, note any jurors in particular that he would have backstruck. There is no jurisprudence to the effect that defense counsel is required to do so in order to preserve his backstrike claim for review. However, the effect of not requiring a defendant to specify at trial who he would have backstruck is to permit a defendant to gamble upon receiving a favorable jury verdict, and then, upon the return of an unfavorable verdict, scour the voir dire transcript for jurors whom he can claim he would have backstruck. As previously noted, at the hearing on defendant’s motion for new trial, defense counsel only gave reasons for why he would have backstruck two jurors, Ms. Foster and Mr. Small. Defendant makes no argument on appeal as to Lovell Taylor, the third juror to whom defendant referred. While Ms. Taylor said she had served on one jury in which the defendant was found guilty of armed robbery, a number of other prospective jurors eventually accepted also had served on prior juries that had found defendants guilty. Defendant has failed to show any prejudice as a result of being denied a right to backstrike Ms. Taylor.
 

 [[Image here]]
 

 While a defendant has a constitutional right under the Louisiana State Constitution to peremptorily strike prospective jurors, there is no constitutional right to Lnbackstrike, only a statutory right. Considering the facts and circumstances of the instant case, defendant has failed to show that he was prejudiced by the trial court’s denial of his statutory right to backstrike or that because he could not backstrike he was thereby denied his constitutional right to peremptorily strike prospective jurors. The error was harmless. That is, the verdict actually rendered in this case was surely unattributable to the error.
 

 Hailey,
 
 at pp. 8-9, 863 So.2d at 569.
 

 Hailey
 
 and
 
 Plaisance
 
 relied heavily on
 
 State v. Crotwell,
 
 2220-2551 (La.App. 1 Cir. 11/9/01), 818 So.2d 34, where defense
 
 *1247
 
 counsel asked during the first voir dire panel if he could backstrike jurors, and the court denied his request. He did not specify any juror that he would have struck. Counsel then waited until after all the jurors had been chosen and the defendant had exhausted his peremptory challenges before objecting to the court’s ruling on backstriking, but again he did not specify whom he would have struck had he been allowed to do so. On appeal, the court found that the trial court erred by prohibiting backstriking, but it further found that such error was harmless, given the facts that the defendant failed to identify any particular juror he would have struck or even allege any specific prejudice that may have occurred as a result of the trial court’s ruling.
 

 Here, the trial court’s error in disallowing backstriking is harmless. Appellant does not argue that he was denied the opportunity to examine the prospective jurors fully. More importantly, neither at trial, in his motion for new trial, nor in his argument to the court does the appellant specify whom he would have backstruck had he been allowed to do so. Given these circumstances, we are unable to find that the jury’s verdicts were attributable to the trial court’s error in disallowing backstrik-ing, and thus the error was harmless.
 

 1 ⅞1 With regard to his second assignment of error, a potential juror, Ryan Johnson, left the courtroom some time during voir dire, and never reappeared. When it became known that the juror was missing, the parties agreed to substitute another potential juror for the missing juror. The appellant argues that Mr. Johnson would have been a favorable prospective juror because he fit the model of jurors he sought: middle or working class African-American males. He argues that the prejudicial effect of Mr. Johnson’s absence was worsened by counsel’s inability to back-strike jurors who had already been accepted. Putting aside the potential
 
 Batson v. Kentucky,
 
 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (peremptory challenges may not be based solely on race);
 
 J.E.B. v. Alabama,
 
 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (extending
 
 Batson
 
 to gender); see also C.Cr.P. art. 795 (no peremptory challenge shall be made based solely on race or gender), problem with the appellant’s espoused intent, he does not explain how the inability to backstrike accepted jurors was worsened by Mr. Johnson’s disappearance. Since Mr. Johnson never reappeared he could never have become a juror even if the defendant had been allowed backstrikes. As noted above, the appellant did not allege whom he would have struck had he been allowed to do so. For the same reasons set forth above, assignment of error two has no merit. In addition, because neither of these claims has merit, the trial court did not err by denying his motion for new trial based upon these grounds. Thus, assignments one and two, as well as assignment four with respect to claims one and two, have no merit.
 

 In his supplemental brief appellant alleges that his right to a meaningful appeal has been violated because the transcript of voir dire is no longer available. In
 
 State v. Sublet,
 
 2005-0123, p. 3 (La.App. 4 Cir. 5/18/05), 904 So.2d 778, 780, this court discussed missing transcripts in an appeal:
 

 122La. Const, art. I, § 19 provides in pertinent part: “No person shall be subjected to imprisonment ... without the right of review based upon a complete record of all evidence upon which the judgment is based.”
 
 See also,
 
 La. C.Cr.P. art. 843, which requires that all trial proceedings be recorded. Louisiana jurisprudence has consistently held that where appellate counsel was not
 
 *1248
 
 trial counsel and no transcript of the testimony of trial is available, a defendant’s right to “appellate review is rendered meaningless ... and the interests of justice require that a defendant be afforded a new, fully-recorded trial.”
 
 State v. Ford,
 
 338 So.2d 107, 110 (La.1976).
 
 See also, State v. Harris,
 
 01-1910 (La.App. 4 Cir. 4/24/02), 817 So.2d 1164;
 
 State v. Johnson,
 
 01-1909 (La.App. 4 Cir. 1/23/02), 807 So.2d 1071.
 

 Nonetheless, the reversal of a defendant’s conviction is not mandated in all cases where portions of trial are missing. As noted in
 
 State v. Scott,
 
 2004-1142, pp. 8-9 (La.App. 4 Cir. 7/27/05), 913 So.2d 843, 849:
 

 In
 
 State v. Frank,
 
 99-0553, p. 21 (La.1/14/01), 803 So.2d 1, 19-20, the Louisiana Supreme Court enunciated a three-part standard for reviewing incomplete record claims. First, “[mjaterial omissions from the transcript of the proceedings at trial bearing on the merits of an appeal will require reversal.” 99-0553 at pp. 20-21, 803 So.2d at 19-20, citing
 
 State v. Robinson,
 
 387 So.2d 1143 (La.l980)(reversing given that testimony of a state and defense expert witness was missing);
 
 State v. Ford,
 
 338 So.2d 107 (La.1976)(finding omissions material, given that substantial portions of the record were missing, including the testimony of four state witnesses, voir dire examination of prospective jurors, and the prosecutor’s opening statements); see also
 
 State v. Bright,
 
 00-1255, p. 8 (La.App. 4 Cir. 2/6/02), 809 So.2d 1112, 1117 (finding record inadequate, given “[t]he cumulative effect of the missing portions of testimony of the defendant and other material witnesses, and the frequency of ‘inaudible’ and ‘spelled phonetically’ in the transcript”);
 
 State v. Diggs,
 
 93-0324 (La.App. 4 Cir. 6/29/95), 657 So.2d 1104, citing
 
 Ford, supra,
 
 (finding the unavailability of an officer’s complete testimony necessitated a new trial because it could not be determined whether the missing testimony was substantial or inconsequential). Second, “inconsequential omissions or slight inaccuracies do not require reversal.”
 
 Frank, supra,
 
 citing
 
 State v. Goodbier,
 
 367 So.2d 356, 357 (La.1979)(declining to reverse when ^record did not include transcript of voir dire examination and the court reporter’s affidavit indicated that no objections were made by the attorneys during voir dire); see also
 
 State v. Lyons,
 
 597 So.2d 593 (La.App. 4 Cir.1992)(declining to reverse when record did not include some of the jury charges, transcript of voir dire, impaneling of jury or opening statement). Third, and “[flinally, a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts.”
 
 Frank, supra,
 
 citing
 
 State v. Castleberry,
 
 98-1388, p. 29 (La.4/13/99), 758 So.2d 749, 773. However, this court has held that under some circumstances a complete appellate review of a conviction and sentence can be accomplished, even when there are missing portions of the trial record. See, e.g.,
 
 State v. Cooley,
 
 98-0576, p. 9 (La.App. 4 Cir. 11/17/99), 747 So.2d 1182, 1187. An incomplete record may be adequate for appellate review.
 
 State v. Hawkins,
 
 96-0766, p. 8 (La.1/14/97), 688 So.2d 473, 480. Finally, a defendant is not entitled to relief absent a showing of prejudice based on the missing portions of the transcripts.
 
 State v. Castleberry,
 
 98-1388, p. 29 (La.4/13/99), 758 So.2d 749, 773.
 

 In support of his assertion, the appellant cites various cases, but in all but one of them the missing portions of the tran
 
 *1249
 
 scripts contained witness testimony
 
 [4]
 
 , and in the remaining one this court vacated a multiple bill adjudication and sentence where the missing transcript pertained to the evidence used to adjudicate the defendant a multiple offender,
 
 State v. Bacot,
 
 unpub. 98-0506 (La.App. 4 Cir. 5/26/99), 739 So.2d 1027. Here, even if the voir dire transcript included the allegations made by the [^appellant, he has not shown that the trial court’s rulings resulted in reversible error. Therefore, the appellant’s supplemental assignment of error has no merit.
 

 III.
 

 By his final two assignments of error, the appellant attacks the length of his sentences. In assignment five he alleges that the trial court erred by denying his motion to reconsider the sentences, and in assignment six he asserts that the sentences imposed were excessive. The appellant received the maximum sentence of ten years at hard labor on both counts, the sentences to run concurrently. See La. R.S. 14:34.
 

 In
 
 State v. Smith,
 
 2001-2574, p. 7 (La.1/14/03), 839 So.2d 1, 4, the Court set forth the standard for evaluating a claim of excessive sentence:
 

 Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that “[n]o
 
 law
 
 shall subject any person to ...
 
 excessive ... 'punishment”
 
 (Emphasis added.) Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness.
 
 State v. Sepulvado,
 
 367 So.2d 762, 767 (La.1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering.
 
 State v. Bonanno,
 
 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion.
 
 State v. Cann,
 
 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion.
 
 State v. Walker,
 
 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462;
 
 cf. State v. Phillips,
 
 02-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906.
 

 See also
 
 State v. Johnson,
 
 97-1906 (La.3/4/98), 709 So.2d 672;
 
 State v. Baxley,
 
 94-2982 (La.5/22/95), 656 So.2d 973;
 
 State v. Batiste,
 
 2006-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810;
 
 State v. Landry,
 
 2003-1671 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235.
 

 In
 
 Batiste,
 
 at p. 18, 947 So.2d at 820, this court further explained:
 

 An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La.C.Cr.P. art. 894.1, as well as whether
 
 *1250
 
 the facts of the case warrant the sentence imposed.
 
 State v. Landry, supra; State v. Trepagnier,
 
 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. However, as noted in
 
 State v. Major,
 
 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813:
 

 The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, resen-tencing is unnecessary even when there has not been full compliance with Art. 894.1.
 
 State v. Lanclos,
 
 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D).
 

 If the reviewing court finds adequate compliance with art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the circumstances of the case, “keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.”
 
 State v. Landry,
 
 2003-1671 at p. 8, 871 So.2d at 1239. See also
 
 State v. Bonicard,
 
 98-0665 (La.App. 4 Cir. 8/4/99), 752 So.2d 184.
 

 Here, prior to imposing sentence, the trial court took the testimony of Mr. Gaines, Mr. Salvant’s mother, the appellant’s uncle, and the appellant. Mr. Gaines testified that the shooting left him fearful. Mr. Salvant’s mother described the daily physical care she rendered to her incapacitated son, noting that her family had forgiven the appellant. The appellant’s uncle testified that the appellant’s father, an ex-policeman, had been convicted of child molestation and had molested hfithe appellant when the appellant was five years old. He insisted that the appellant had not been in trouble prior to the present shooting. The appellant stated that he had a lot of remorse for the shootings and offered his family’s help to the families of the victims.
 

 The trial court noted that it “vividly” remembered the testimony elicited at trial. The court stated that it did not know at trial about the appellant’s father’s actions, but these circumstances did not justify the appellant’s actions. The court described the shootings as a “vicious, unprovoked attack” on the victims that seriously injured one and maimed the other for life. The court noted that the dispute arose over the appellant’s feelings that he had been “disrespected.” The court also noted the victims’ forgiveness, but it felt that it must “make sure that you’re held accountable for what happened.” Finding that the victims suffered needlessly and continued to suffer, the court imposed two concurrent ten-year sentences at hard labor. Given these circumstances, the court adequately complied with La.C.Cr.P. art. 894.1.
 

 In comparison to other sentences upheld by this court for aggravated battery, the trial court did not impose an excessive sentence. In
 
 State v. Moss,
 
 2008-1079 (La.App. 4 Cir. 7/22/09), 17 So.3d 441, the defendant beat his daughter’s boyfriend with a pair of pliers and seriously injured him. The trial court imposed an eight-year sentence on the defendant, noting that while the defendant did not have any prior convictions, he showed no remorse during the presentence investigation, only showing remorse at the time of sentencing. This court rejected his excessive sentence claim. In
 
 State v. Gorby,
 
 2003-1666 (La.App. 4 Cir. 2/11/04), 868 So.2d 193, the defendant was originally charged with attempted second degree murder but was convicted of aggravated battery. He beat
 
 *1251
 
 his wife 127when she told him that she was leaving him, inflicting several injuries. This court upheld his ten-year sentence. In
 
 State v. Brown,
 
 2003-0723 (La.App. 4 Cir. 7/23/03), 853 So.2d 665, the defendant inflicted life-threatening injuries on the victim when he shot him several times. This court rejected his argument that his ten-year sentence was excessive.
 

 This court also upheld a ten-year sentence for aggravated battery in
 
 State v. Trepagnier,
 
 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. The defendant shot the victim during an attempted armed robbery. In rejecting the excessive-sentence claim, this court noted: “This court has held that a ten-year sentence for shootings that result in an aggravated battery conviction is not excessive.
 
 State v. Smith,
 
 94-2588, p. 8 (La.App. 4th Cir.3/27/96), 672 So.2d 1034, 1039;
 
 State v. Hawkins,
 
 95-0028, pp. 4-5 (La.App. 4th Cir.3/29/95), 653 So.2d 715, 717-18.”
 
 Trepagnier
 
 at 12, 744 So.2d at 189-190. In
 
 Smith,
 
 cited in
 
 Trepagnier,
 
 the defendant was charged with one count of second degree murder and one count of attempted second degree murder. He was found guilty as charged on the murder count and guilty of aggravated battery. One victim was injured when he fired into an apartment. This court upheld his ten-year sentence. In
 
 Hawkins,
 
 cited in both
 
 Trepag-nier
 
 and
 
 Brown,
 
 this court found that the evidence supported a charge of aggravated battery where the defendant chased down the victim after an automobile accident, shot at him, threatened to kill him, grabbed him, put a gun to his head, and then shot up the victim’s van. This court also found that his ten-year sentence as a first offender was not excessive.
 

 Here, the appellant argues that his ten-year sentences are excessive, citing two
 
 manslaughter
 
 cases from this court, one of which was reversed by the Supreme Court.
 
 State v. Soraparu,
 
 96-0116 (La. App. 4 Cir. 2/5/97), 688 So.2d 1320,
 
 reversed
 
 97-1027 (La.10/13/97), 703 So.2d 608; and
 
 State v. Coleman,
 
 94-0666 (La.App. 4 Cir. 12/15/94), 647 So.2d 1355. He argues that he has no prior convictions, and the court abused its discretion by imposing two maximum sentences. However, the presentence investigation report, which is included in the record indicates that the appellant had several arrests pri- or to this offense, including five for battery, one involving his battering of his wife with a flashlight that was dismissed when his wife could not be found for trial. According to the report, during that incident the defendant also shoved his grandfather to the floor when he tried to intervene. The report also indicated that the appellant was molested by his father when he was five years old and that his father is serving a life sentence for the aggravated rape of the appellant’s sister. The report indicated that although he was eligible for the IMPACT program, the probation office recommended against it due to the appellant’s violent behavior.
 

 Considering the circumstances of this case, we find that the trial court did not abuse its discretion by imposing the concurrent ten-year sentences for his shooting of the victims, one of whom became a quadriplegic as a result of the shooting. These assignments have no merit.
 

 For the foregoing reason we affirm the appellant’s convictions and sentences.
 

 AFFIRMED.
 

 [1]
 

 . Although the minute entry of sentencing erroneously states that the court imposed these sentences without benefit of parole, probation, or suspension of sentence the transcript of sentencing indicates that these sentences were correctly imposed without these prohibitions.
 

 [2]
 

 . When a defendant raises sufficiency of evidence as well as other assignments of error, a reviewing court should first determine if the evidence adduced at trial is sufficient. See
 
 State v. Hearold,
 
 603 So.2d 731 (La.1992);
 
 State v. Shaw,
 
 2007-1427 (La.App. 4 Cir. 6/18/08), 987 So.2d 398,
 
 writ denied State ex rel. Shaw v. State,
 
 2008-1957 (La.5/15/09), 8 So.3d 574.
 

 [3]
 

 . This court so held, even though other courts of appeal in Louisiana have held that as an affirmative defense, the defendant has the burden of showing justification by a preponderance of the evidence. See
 
 State v. Wright,
 
 99-1137 (La.App. 3 Cir. 3/1/00), 758 So.2d 301, writ den.
 
 State ex rel. Wright v. State,
 
 2000-1614 (La.3/9/01), 786 So.2d 118;
 
 State v. Barnes,
 
 491 So.2d 42 (La.App. 5 Cir.1986). See also
 
 State v. Cheatwood,
 
 458 So.2d 907, 910, fn. 4 (La.1984), where the Court discussed this burden and stated: “It is logical to conclude that the Legislature intended to require
 
 the
 
 state to prove beyond a reasonable doubt only the elements of offense and to require defendant to prove by preponderance of the evidence the exculpatory circumstances constituting the 'affirmative' defense.... The statutory provisions setting forth the state's burden of proof refer only to the requirement that the state
 
 prove
 
 the elements of the crime — not that the state disprove the exculpatory circumstances constituting defenses which defeat criminal culpability despite proof of the presence of all elements of the offense.” (emphasis supplied)
 

 [4]
 

 . See
 
 State
 
 v.
 
 Ford,
 
 338 So.2d 107 (La.1976) (not only were the voir dire and opening statement missing, but the testimony of four witnesses was also missing);
 
 State v. Noel,
 
 unpub. 99-1415 (La.App. 4 Cir. 3/1/00), 761 So.2d 823 (testimony of three witnesses missing);
 
 State v. Bell, unpub.
 
 97-1615 (La.App. 4 Cir. 10/21/98), 731 So.2d 558 (entire trial transcript missing);
 
 State v. Clark
 
 2000-0348 (La.App. 4 Cir. 12/13/00), 776 So.2d 1249 (entire first day of trial, including testimony of several witnesses, missing);
 
 State v. Dickerson,
 
 unpub. 2000-2324 (La.App. 4 Cir. 3/28/01, 793 So.2d 571) (testimony of three of four witnesses missing);
 
 State v. McGee,
 
 unpub. 2000-0347 (La.App. 4 Cir. 7/26/00, 786 So.2d 979) (entire trial transcript missing);
 
 State v. Jones,
 
 unpub. 2000-0298 (La.App. 4 Cir. 11/21/00, 775 So.2d 718) (testimony of several witnesses missing, and what was there included several inaudible portions).