STATE OF LOUISIANA      *      NO. 2024-KA-0480

VERSUS      *

     COURT OF APPEAL

JOHN HONORE      *

     FOURTH CIRCUIT

     *

     STATE OF LOUISIANA

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 554-135, SECTION "D"
Judge Kimya M. Holmes,
* * * * * *
**Judge Daniel L. Dysart**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Rosemary Ledet, Judge
Monique G. Morial)

Mary Constance Hanes
LOUISIANA APPELLATE PROJECT
P.O. Box 4015
New Orleans, LA 70178-4015

     COUNSEL FOR DEFENDANT/APPELLANT


Jason R. Williams
DISTRICT ATTORNEY
Brad Scott
CHIEF OF APPEALS
ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
619 South White Street
New Orleans, LA  70119

     COUNSEL FOR STATE OF LOUISIANA/APPELLEE

**AFFIRMED**
**MAY 21, 2025**

DLD
RML
MGM  In this criminal appeal, the Defendant/Appellant, John Honore, appeals the trial court's imposition of a life sentence pursuant to *Dorthey* and its finding that he was not entitled to a downward departure from the mandatory life sentence. For the reasons that follow, we affirm the Defendant's sentence imposed by the trial court.

**STATEMENT OF CASE**

On April 28, 2022, the Appellant, John Honore, was charged by grand jury indictment with one count of La. R.S. 14:30.1 (second degree murder) for the death of Linda Frickey. Because Appellant was seventeen years old at the time of the offense, he was initially charged in juvenile court, and the State later elected to prosecute him as an adult in Criminal District Court. On May 4, 2022, Appellant pled not guilty to the charge.

On November 20, 2023, trial commenced with voir dire proceedings. On that same date, all three of Appellant's co-defendants, Briniyah Baker, Mar'qel Curtis, and Lenyra Theophile, pled guilty to the amended charge of La. R.S. 14:31(27) (attempted manslaughter), and all three were sentenced to twenty years

1

imprisonment at hard labor. Following voir dire, trial was recessed until November 27, 2023.

Before trial resumed, defense counsel requested a psychiatric evaluation of Appellant to determine his competency to proceed. Dr. Sarah Deland evaluated Appellant on November 24, 2023 and issued a report on November 26, 2023, finding that Appellant was "marginally competent."

On November 27, 2023, Appellant filed a "Notice of Acknowledgement of Responsibility" where he handwrote a letter of apology to the Frickey family.

Trial resumed on November 27, 2023, and the jury returned a unanimous guilty verdict.

On January 12, 2024, Appellant filed a motion for new trial and a motion for a post-verdict judgment of acquittal which the trial court denied that same day. Following the denial of those motions, Appellant waived sentencing delays and proceeded to sentencing. Both the State and Defense presented witnesses and exhibits at the sentencing hearing. Ultimately, Appellant was sentenced to life imprisonment with the possibility of parole after serving twenty-five years.

On February 8, 2024, Appellant filed a motion for appeal, which the trial court granted on May 10, 2024. On February 15, 2024, Appellant filed a motion to reconsider sentence, which the trial court denied on March 6, 2024. The Louisiana Appellate Project was appointed to represent Appellant.

On October 21, 2024, Appellant filed a motion for leave of court requesting to file a *pro se* supplemental brief and for a copy of the record, which this Court granted on October 24, 2024. As of April 16, 2025, no supplemental brief has been filed. Through counsel, Appellant filed his brief in this Court on December 23, 2024, and the State filed its brief on January 17, 2025.

**STATEMENT OF FACT**

At the trial of this matter, both the State and the Defense called a number of witnesses. Leigh Ann Mascar testified that she "unfortunately . . . had a front row seat to the murder." In March 2022, Mrs. Mascar lived on Bienville Street with her husband, Mark Mascar. Mrs. Mascar testified that on March 21, 2022, at approximately 1:30 p.m., she heard loud noises outside of her home and went outside to her porch to investigate. While she went to the porch, her husband was in the couple's backyard. Mrs. Mascar stated she saw "a car dragging something" and described it as "look[ing] like a mannequin being drug outside of a car." She then realized the car was dragging a person and heard the person saying, "let me go." Mrs. stated that as she ran towards the car, the car slowed down "directly in front" of her, and she saw the driver open the door and attempt to "dislodge" the person. She testified that the driver could not dislodge the person because of "the piece of trash stuck to the car" at which point the car drove on.

Mrs. Mascar stated that her husband came up from behind her, and they both walked across the street through the parking lot attached to Rouse's. At this point, she saw the victim lying on the sidewalk with her head "in all these cables" and saw her severed arm. She further testified that the victim was naked and someone placed a jacket over the victim's body while she ran home to get a sheet to cover the body.

While Mrs. Mascar ran home to get a sheet, she stated that her husband stayed with the victim because they thought the victim might still be alive since "her throat was still moving." After she returned with the sheet, Mrs. Mascar testified that someone called 911. Mrs. Mascar also testified that following the incident, she and her husband received trauma counseling.

3

The defense did not cross examine Mrs. Mascar.

Mark Mascar testified that on the day of the incident, he was in the backyard when he heard screaming, which prompted him to run to the front of the house. He further testified, "as I approached Bienville . . . I heard a noise which I thought was plastic being dragged by a car . . . it sounded like, when an oil pan underneath a car scrapes." He eventually saw someone being dragged by the car and heard his wife screaming at the driver, who was trying to dislodge the person. Mr. Mascar ran across to the street to join his wife and testified that the car was gone by the time he was near Rouse's. Mr. Mascar stated he turned around to go home but then saw the victim lying on the ground along with her severed arm. He then testified that while his wife ran to get a sheet, he stayed with the victim who was "kinda [sic] responsive." He heard "heavy breathing" coming from the victim and stated she had a pulse, but eventually she died in front of him. Mr. Mascar testified that the police arrived before EMS.

The defense did not cross examine Mr. Mascar.

Detective Raynell Johnson ("Det. Johnson") testified that he had worked with New Orleans Police Department ("NOPD") for fifteen years and has been a homicide detective for ten years.

On direct examination, Det. Johnson testified that he was the lead detective in this case. Det. Johnson stated that when he arrived at the scene, there were several officers already there along with "lots" of pedestrians and onlookers. Through the investigation, Det. Johnson learned that the incident began near the corner of Bienville Street and North Scott Street, which was also near the victim's place of employment. Det. Johnson obtained surveillance footage from the victim's workplace at 3909 Bienville Street which the State introduced as State's Exhibit 2.

4

The footage displays the time as 12:14:02, but Det. Johnson testified that he learned the footage was an hour behind, so the footage begins at 1:14 p.m. Det. Johnson testified that one set of footage was angled towards Bienville and showed the victim's gray sedan while the other set of footage faced the opposite direction towards Conti Street. The State did not play the entirety of the surveillance footage.

A review of State's Exhibit 2A from 1:31 p.m. to 1:33 p.m., which is the same timeframe the State elected to present at trial, shows a group of four individuals walking on the sidewalk, briefly stopping at the intersection, then the four begin walking again with three individuals walking towards the victim's car and the fourth individual standing near a stop sign at the intersection. The footage shows a gray SUV parked directly behind the victim's car. The person identified by Det. Johnson as Appellant approached the back of the victim's car, stopped, then walked out of the frame towards the gray SUV at timestamp 12:32:26 (1:32 p.m.). At timestamp 12:32:50, the individual, who did not walk towards the victim's car, reappeared in the footage and stood near the intersection. At timestamp 12:33:00, the person identified as Appellant along with one other individual reappear in the footage. Appellant is seen opening the driver's side door and pointing an object at the victim while a second individual enters the front passenger side. Appellant appears to pull the victim out of the car while striking her. Eventually, the footage shows all four individuals enter the car with Appellant in the driver's seat. At timestamp 12:33:30, one individual exits the car from the rear passenger seat. At timestamp 12:33:39, the car begins to drive with the driver's door open. As the car drives forward, the victim is seen hanging out of the driver's side door at timestamp 12:33:46, and the car proceeds to make a right turn

5

with the victim being dragged alongside the driver's side. The car exits the frame at timestamp 12:33:52.

As to the footage facing Conti Street, which Det. Johnson testified was the opposite angle from the previous footage, the State played the footage from timestamp 12:31:00 (1:31 p.m.) to timestamp 12:33:14 (1:33 p.m.). This footage does not show the victim's car but does show the rear of the gray SUV parked directly behind the victim's car. A review of State's Exhibit 2B at timestamp 12:32:25 (1:32 p.m.), reflects three individuals appearing in the footage, which is the same time the three individuals disappear in the footage discussed in the previous paragraph. At timestamp 12:32:34, the person identified as Appellant stands near the gray SUV parked behind the victim's car along with the individual who later enters the passenger side of the victim's car while the third individual walks away. At timestamp 12:32:55, the third individual turns around and begins walking towards Appellant while Appellant and the person who later enters the passenger side walk back towards the victim's car.

Det. Johnson testified that surveillance footage was also collected from 320 North Carrollton Street (introduced as State's Exhibit 3), which is where the victim's body was found. Det. Johnson clarified that, just as the previously discussed footage, the timestamp was an hour behind. The footage begins at 12:33:27 (1:33 p.m.) and ends at 12:35:06 (1:35 p.m.). The State played the entirety of the video. Det. Johnson described the footage as showing the victim's car traveling on Pierce Street from Bienville and "driv[ing] across the sidewalk and kinda [sic] go[ing] over that yellow curb." At timestamp 12:34:31, Det. Johnson testified that co-defendants, Lenyra Theophile and Mar'qel Curtis, are seen "kinda [sic] running towards . . . Rouse's parking lot." Det. Johnson testified that he

6

measured the distance from where the victim's body was found to where the incident began and determined it was approximately 700 feet, "basically two football fields."

Det. Johnson also collected surveillance footage from 3745 Bienville Street (State's Exhibit 4) and testified that this location was approximately one block away from North Scott Street[1]. He described the footage as showing Appellant and his three co-defendants walking north up Bienville towards North Scott Street prior to the murder. Det. Johnson testified that he took screenshots from the footage to create a BOLO (wanted bulletin).

After the BOLO was issued, Det. Johnson testified that Elyria Chambliss contacted him at approximately 11:00 p.m. that same night and identified two individuals in the BOLO as her son (Appellant) and his girlfriend, "Nyra" (co-defendant Lenyra Theophile). Det. Johnson stated that Elyria Chambliss then came into the police station and was presented with a confirmation photo (State's Exhibit 5). Det. Johnson also stated that Elyria Chambliss informed him that Appellant and his girlfriend were at 5519 Mandeville Street. Following the identification, Det. Johnson obtained an arrest warrant for Appellant in juvenile court (State's Exhibit 6) along with a search warrant for 5519 Mandeville Street (State's Exhibit 7).

Upon searching the residence, a sweater and pair of Dickey pants were recovered which Appellant stipulated were the same items worn by him earlier that day. Det. Johnson testified that a pair of "fuzzy slippers" was also collected

---

[1] At various time in his testimony, Det. Johnson refers to both North Scott Street and South Scott Street. The correct location is North Scott Street.

because Lenyra Theophile was seen in the surveillance footage wearing those same slippers.

Det. Johnson testified further that the victim's car was recovered on Dumaine Street, which was "a nice little distance" from where the incident began and the victim's body was found. Det. Johnson obtained surveillance footage from 2913 Dumaine Street (State's Exhibit 11) and 2830 Dumaine Street (State's Exhibit 12), which he testified depicted the discarding of the car.

Det. Johnson stated that the victim's car was taken to police headquarters for processing. Photos of the car's exterior depict two flat tires and blood splatter on the rear driver's side door. Upon searching the victim's car, Det. Johnson testified that a can of pepper spray was located in the driver's seat, and he explained that the can's "trigger guard show[ed] that it [had] been pressed" allowing a "steady stream" of pepper spray. An Apple earbud was also located inside of the car, and the parties stipulated that Appellant's DNA matched the DNA profile located on the earbud.

Det. Johnson testified that the victim's keys were recovered near the corner of Pierce Street and Bienville. Through the investigation, Det. Johnson determined that a blood splatter path began near North Scott Street and followed the path of the vehicle to North Pierce Street. Det. Johnson further testified that pictures were taken of the victim to document her injuries, which included her severed arm and abrasions to her head and the back of her body. He testified that the victim's brain was exposed. Det. Johnson stated that the victim was found lying near a utility pole that had wires protruding from it.

On cross examination, Det. Johnson stated that the victim was declared dead at 1:55 p.m., which was approximately twenty minutes after the 911 call was

placed. He testified that, based on his investigation and information from the coroner, the victim's arm was severed by the utility pole wires. Det. Johnson did not know whether the victim's head injuries were caused by striking the utility pole or by the dragging from the vehicle.

The State also called Dr. Erin O'Sullivan, who worked as a forensic pathologist for the Orleans Parish Coroner's Office. The parties stipulated to her qualification as an expert in forensic pathology. Dr. O'Sullivan testified that she performed the victim's autopsy and created a report of her findings (State's Exhibit 21). Dr. O'Sullivan described the victim's injuries as "blunt force injuries" and testified there was no way to decipher in what order they were inflicted. Dr. O'Sullivan testified that "many of these injuries could have been fatal in a woman of [the victim's] age," including amputation of her left arm, a laceration of her subclavian artery and vein, a tear in her aorta, and a subdural hemorrhage (a "small amount of blood covering [the victim's] right side of her brain").

The defense did not cross examine Dr. O'Sullivan.

The victim's younger sister, Jinny Lynn Griffin, described the victim as a "wonderful person" who "helped everybody she could, whenever she could." The defense did not cross examine Ms. Griffin. Following Ms. Griffin's testimony, the State rested.

The defense called the Appellant's mother, Elyria Chambliss, to testify. She recalled identifying her son (Appellant) and his girlfriend (co-defendant, Lenyra Theophile) in March 2022 "because that was the right thing to do, to turn him in."

Ms. Chambliss confirmed that Lenyra Theophile sent her an apology letter, which the Defense introduced for record purposes only as Defense Exhibit 1. In the letter, Ms. Theophile writes that "I know you prolly [sic] don't like me nomore

[sic] because of da [sic] type of situation I got your son in." Ms. Theophile's letter goes on to describes her and Appellant's relationship and how she "wish[ed] [Ms. Chambliss] like[d] [her]."

Ms. Chambliss also identified Appellant and his father in a picture introduced as Defense Exhibit 2. In the photo, Appellant's father is wearing a "Hustler's" t-shirt while holding up his middle finger. Ms. Chambliss testified that she and Appellant have protective orders against Appellant's father. She further identified Appellant in Defense Exhibit 3, a photo of Appellant holding two certificates (Student of the Month and a Certificate of Achievement). The State did not cross examine Ms. Chambliss and the Defense rested.

Following closing arguments, the jury retired to deliberate. Later that day, the jury returned a unanimous verdict finding Appellant guilty as charged.

On January 12, 2024, Appellant filed motions for new trial and a post-verdict judgment of acquittal, which the trial court denied. Following the denial of those motions, Appellant waived sentencing delays and proceeded to sentencing.

During the sentencing phase, the State called two witnesses and recalled one Defense witness in rebuttal. The Defense presented six live witnesses and one witness via affidavit. The parties also introduced several exhibits.

Kathy Richard, the victim's sister-in-law, testified that "what you [Appellant] did was just so horrible, it was demonic." She testified further that Appellant would be known as a "grandmother killer" in prison and wished that he never "have a night's peaceful sleep." She warned that "they are [other prisoners] are going to know . . . [and] are waiting for you."

Ms. Richard stated that Appellant had no remorse and was "just a product of a broken society." She testified that "[w]hen Linda took her last breath, she had

10

people there that cared for her. . ." and wished that when Appellant "take[s] [his] last breath, may the only thing [he] know is the hell hounds coming after [him] to drag [his] ass back down to where [he] belong[s]." She viewed Appellant as a "vile waste of flesh coward" and "hope[s] [he] do[es] not make it out of there and them hell hounds come after [him] quick."

Danielle Duffourc, the victim's niece, read a letter aloud in which she described the victim as a "remarkable woman" with a "kind and giving spirit." Ms. Duffourc stated that she "w[oke] up at night feeling like [her] skin was on fire from the trauma of [the victim's] loss." Ms. Duffourc further testified that she "had to make peace with what happened because it did happen." She stated, "[t]here are no winners here."

The defense called Angela Robertson, Appellant's paternal aunt. She testified that Appellant stayed with her on weekends, holidays, and during the summer. She recalled one occasion when Appellant tried to live with her by "r[unning] to the police to get assistance[,] and they [the police] called [her] to pick [Appellant] up." Ms. Robertson stated that Appellant "begged [her] to . . . live in [her] home[,]" but "due to circumstances [she] couldn't take him in." She reflected that if she had let Appellant live with her permanently, "[she] doesn't feel like we would be sitting here right now."

Ms. Robertson also stated that Appellant lived in several places throughout his childhood, in part due to Hurricane Katrina, including Houston, Atlanta, homeless shelters, abandoned houses, and various apartments in New Orleans which she described as "deteriorated." She described Appellant's mother as financially unstable and opined that her children were not eating enough. Ms. Robertson testified that Appellant's mother did not receive any child support from

11

Appellant's father. The trial court also took judicial notice that Appellant's father "ha[d] been in jail multiple times."

Ms. Robertson described Appellant as "lively, loving, [and] always caring." She stated that when he stayed with her, he helped care for her father, who had Alzheimer's, and helped with chores without being asked. She stated that Appellant's mother worked at a senior citizen center and that he went to the center to "run errands for the senior citizens." She also stated that Appellant helped his mother at the laundromat and would "help [his mother] catch the bus" around 1:00 a.m. – 2:00 a.m. because "he wanted to see her get home securely and safely." Ms. Robertson testified that following his arrest, she paid for Appellant's commissary and phone minutes, but "he told me to cut it off" because his mother was sick and "he wanted his brother and sister to receive the funds."

Professor Tim McEvoy, an assistant clinical professor in Tulane Law School's Domestic Violence Clinic, who had previously worked as a domestic violence attorney at Southeast Louisiana Legal Services, and had represented Ms. Chambliss and her children for the past ten years in custody disputes and domestic violence matters involving Appellant's father, described Ms. Chambliss as a "devoted mother" and "hard worker[,]" who died in the hospital on December 27, 2023.

Over the State's objection, Professor McEvoy testified that his representation of the family was "the most complex case because of the number of times we had to reenter the civil court system on behalf of [the family] because of the actions of [Appellant's] father." He described multiple instances during which Appellant's father threatened Appellant and his family along with the judge presiding over the family's custody and protective order matters. When Appellant

lived with his mother in Atlanta, Professor McEvoy described an incident during which Appellant's father burned Ms. Chambliss with an iron in front of Appellant and his siblings. On the day of Appellant's trial (November 27, 2023), Professor McEvoy testified that as he left the courthouse to bring Ms. Chambliss to the hospital, the father was "outside the courthouse screaming and threatening his sister [Angela Robertson, *supra*] [by] chasing her around the car" and "threatening [Appellant's oldest sister]." He stated the father only stopped because courthouse deputies became involved. Professor McEvoy also recalled instances where the father beat Appellant, including a time when Appellant "got in trouble at school" and the father "started punching him."

Professor McEvoy described Ms. Chambliss as "proud to a fault" and although she "tried her best[,] [she] was often caught in circumstances she couldn't prevent[,]" including keeping Appellant's father away from her and her children. He stated that Ms. Chambliss' attempts to keep Appellant away from his father during Appellant's teenage years became more difficult because his father's "influence was maintaining." However, he described Ms. Chambliss' relationship with Appellant as "loving him no matter what." Professor McEvoy recalled instances during which Appellant would ride the bus with Ms. Chambliss "at 2 a.m. because unfortunately that's where Big John [Appellant's father] . . . would try to find her" by "wait[ing] on the bus route."

The defense called Dr. Danielle Wright**,** a therapist for Atlas Psychiatry, who also taught graduate students at Tulane University School of Social Work and directed Navigate NOLA, a nonprofit focused on "social and emotional learning interventions" in public schools, as an expert. The State objected on relevancy grounds arguing that her testimony was "irrelevant sympathy" because "this is not

a *Dorthey* situation" involving sentencing under the habitual offender statute. Eventually, the trial court qualified Dr. Wright as an "expert in adolescent and childhood development related to trauma."

Dr. Wright testified that she created a report that detailed "every traumatic experience . . . or adverse childhood experience" in Appellant's life to describe its impact on "brain development" and "genetic expression[,]" which was introduced as Defense Exhibit 3. The culmination of these adverse experiences, Dr. Wright explained, causes "toxic stress," which impacts a child's decision-making process, and how that child may respond to future stressful situations.

Dr. Wright testified that the first three years of a child's life are the most significant to brain development. In Appellant's case, Dr. Wright created a "trauma timeline" (included in Defense Exhibit 3) detailing adverse experiences he had beginning from six months of age to his current age at the time of sentencing (eighteen years old). In the first three years of Appellant's life, Dr. Wright described several traumatic experiences Appellant endured, including housing instability from Hurricane Katrina, parental arrests, witnessing domestic violence by the hands of his father, and living in poverty. She explained that witnessing domestic violence as a young child shapes how that child responds to future stressful situations and testified that the child is likely to present a "fight response." Dr. Wright testified that with access to "quality" mental health care, Appellant can be "rehabilitat[ed]."

Professor Becki Kondkar, a professor in Tulane Law School's Domestic Violence Clinic and co-director of the Tulane Women's Prison Project was qualified by the trial court as an "expert in the limited impact of intimate family violence on children."

Professor Kondkar stated she had known Appellant since 2016 because of the clinic's work with his mother and siblings. She explained that witnessing domestic violence as a child can cause developmental delays and behavioral problems. As these children get older, she testified, they carry a higher risk of suicidality, substance abuse, assaultive behaviors, and "additional victimization." She explained that early childhood exposure to domestic violence can "normalize" such behavior to a child, especially when the acts are committed with impunity. She testified that abusers may "use the children as a weapon . . . in the custodial court system[,]" as a means of "control[ling] and punish[ing] [their victim] for decades, which is exactly what happened with Ms. Chambliss." She further explained that:

> [W]hen you have a legal system that tells a kid like [Appellant] that this dad[,] who has abused at least . . . five women sought protection from him in the form of either protective orders or arrests, that this dad[,] who does this in front of you[,] is a good enough dad for you[,] and it's not a big enough deal that we need to protect you from him. That also normalizes violence in the same way that being in a home normalizes it.

Professor Kondkar clarified that she was not "excusing" Appellant's actions but stated his childhood experiences contextualize the conduct because "the very specific actions that he engaged in[,] in terms of punching, kicking, and throwing to the ground, are things that he saw not just once in his life but at various states in his life . . . ."

Dr. Sarah Deland, who was qualified by the trial court as an expert in forensic psychiatry, testified that she interviewed Appellant on November 24, 2023. Following the interview, she prepared a report which was introduced as Defense Exhibit 5. She explained that her medical opinions were formulated by interviewing Appellant, reviewing his past medical and schooling records, and

15

conducting a collateral interview with his aunt (Angela Robertson). Dr. Deland concluded that Appellant suffered from attention deficit hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), depressive disorder, and cannabis use disorder. Dr. Deland noted that Appellant also had a previous diagnosis of "unspecified schizophrenia spectrum disorder." She testified that childhood trauma is a significant risk factor for these diagnoses.

In reviewing Appellant's medical records, Dr. Deland noted that he was prescribed several stimulants, antipsychotics, and antidepressants. Dr. Deland testified that his records showed he never received any consistent treatment until his incarceration. She noted that his records described incidents when his father "took him away" from treatment and even threatened some mental health facilities, which in turn, stopped treating Appellant. Dr. Deland testified that Appellant was hospitalized for suicidality and was taken to the emergency room several times because "the school called the crisis unit." She further noted that his school records reflected that he was "operating below his age and grade level."

Dr. Deland testified that during her interview with Appellant, he was cooperative yet "reluctant" to discuss traumatic experiences, including instances of sexual abuse he faced. She testified he answered questions but was not "overly concrete" and "didn't expand upon his answers like most people would [during] normal conversation." She testified that the only time he spontaneously spoke was when he discussed "not just the horribleness of the incident but the ripple effect [and] how many people's lives ha[d] been negatively [impacted][,] [including] her family, her friends, her coworkers, his family, the people [who] cared about him, [and] the people who witnessed it." Dr. Deland stated that it "surprised" her that he appeared "genuinely remorseful."

16

Dr. Deland also testified that she found Appellant to be competent regarding his ability to understand the proceedings but did find him to be "marginally competent" regarding his ability to assist in his defense because of his PTSD symptoms, including his "difficulties freely sharing information" and his "paranoia regarding [the] Defense team." Dr. Deland testified that Appellant's difficulties did not "r[i]se to the level to say that he was not competent."

While Appellant had been in custody "for quite some time" before Dr. Deland interviewed him, she described Appellant's "presentation [as] . . . a much [sic] higher functioning individual" than how he appeared in the records she reviewed. She testified that his low school performance, medical records, and numerous hospitalizations were "all warning signs that he had significant mental health problems but [was] never afforded the opportunity to have any consistent level of treatment." Dr. Deland stated that she believed Appellant "does very well" with appropriate supervision and guidance.

Rachel Lewis, the Chief Academic Officer at Travis Hill School, testified that she met Appellant when he was incarcerated at the Juvenile Justice Intervention Center, which is where the Travis Hill School is located. As a part of her work with Appellant, she reviewed his school records, including prior Individualized Education Plans ("IEP"), which she described as "a plan . . . created for a student with disabilities." Ms. Lewis testified that Appellant first received an IEP and special education services in 2014, when he was eight years old. She stated that in 2017, when Appellant was twelve years old, he was diagnosed with a learning disability and was "qualif[ied] for services under the exceptionality of emotion disturbance."

Ms. Lewis further stated that she was familiar with the U.S. Department of Justice's report regarding juvenile delinquency which describes five factors that are most likely to lead to involvement in the criminal legal system, including poverty, academic difficulties, family violence, community violence, and hyperactivity. She testified that Appellant had experienced all five factors since as early as age eight. Ms. Lewis testified that Byron Goodwin, her supervisor and director of the Travis Hill School, and she wrote a letter for Appellant's sentencing which was introduced as Defense Exhibit 6.

Ms. Lewis stated that since Appellant started at the Travis Hill School, "he didn't get into a lot of trouble." She described, "seeing a different student than the one described in the reports from his previous schools." She testified that Appellant's communication and coping skills had improved along with his academic performance. She stated that Appellant completed required state assessments in order to earn a high school diploma and was currently in the twelfth grade.

The Defense planned to call another witness, Terrell Washington, but Mr. Washington was not present. Defense counsel then introduced an affidavit from Genevieve Hampson, an investigator on Appellant's case who interviewed Mr. Washington on December 5, 2023. Mr. Washington stated he was a teacher for the past seven years and met Appellant at the ReNEW Therapeutic program during Appellant's seventh to eighth grade years. He was Appellant's "one-on-one support person[,]" and they "spent all day with each other for years." Mr. Washington described Appellant as having poor hygiene and never having "proper rest," and stated he "was unkempt and his clothes looked dirty." He stated that Appellant's father "was always agitated and aggressive" and that it appeared

18

Appellant's mother was afraid of his father, who Appellant "idolized." Mr. Washington stated that Appellant "was able to focus when he started taking medication" but that his "medication management was never kept in place." Thereafter, the defense rested.

Angela Robertson was recalled as a witness during the State's rebuttal. During her direct, the State introduced a purported jail call between her and Appellant allegedly made on November 20, 2023 (State's Exhibit 2). The State argued that this jail call provided proof that Appellant lacked remorse. During Angela's direct, she identified her voice on the call, and the State proceeded to play the call in its entirety without asking any additional questions. On cross examination, Angela testified that when Appellant said "forget those people," he was referring to his co-defendants who pled guilty earlier that day. Angela testified that Appellant "has always been remorseful."

Following arguments from both parties, the trial court sentenced Appellant to life imprisonment at hard labor with the possibility of parole after twenty-five years.

**ERRORS PATENT**

A review of the record pursuant to La. C.Cr.P. art. 920 reflects no errors patent.

**DISCUSSION**

In his first assignment of error, Appellant asserts that "the district court erred in concluding that it had no discretion to impose a sentence less than the mandatory life sentence for second degree murder pursuant to *State v. Dorthey*, 623 So.2d 1276 (La. 1993)."

In *State v. Dorthey*, the Louisiana Supreme Court held that a trial court may grant a downward departure from a mandatory sentence in the context of the habitual offender laws if the mandatory sentence constitutes excessive punishment. 623 So.2d at 1280. In subsequent cases, the Louisiana Supreme Court held that such discretion to depart from a mandatory minimum sentence is not limited to sentences derived from the imposition of the habitual offender statute. *See State v. Fobbs*, 99-1024 (La. 9/24/99), 744 So.2d 1274 (*per curiam*) (noting that "[o]ur observation in *Dorthey*, that 'the review of sentencing, including sentencing under R.S. 15:529.1, is a long established function of the judicial branch,' does not, nor did we intend it to, restrict the sentence review principles espoused in that decision solely to the mandatory minimum penalties provided by La. R.S. 14:529.1.") (internal citations omitted).

In the middle of Dr. Wright's testimony, the State raised a relevancy objection and argued that her testimony was "irrelevant sympathy" because *Dorthey* involved sentencing pursuant to the habitual offender statute and Appellant's juvenile status had already been factored in since he is parole eligible after serving twenty-five years. In sustaining the objection, the trial judge stated that the Defense was "confusing" the sentencing hearing with trial and that "every witness . . . [is] testifying to things that could have been either a trial issue based on how you pled, or something that goes before the Parole Board. That's not what we are here for today."

The trial court stated "[t]he sentence is what the sentence is" and asked defense counsel how the mandatory sentence was excessive. The trial court asked:

> How [does] any of the [evidence] . . . give me the authority to reduce
> his sentence . . . [h]e had a bad life, he did. His father did bad things,
> his [m]om did the best she could under horrible circumstances. I get

all of that. I appreciate all of that. Again, that is not what we are here for today.

Defense counsel explained that he was trying to prove that the sentence was excessive by presenting evidence regarding Appellant's individual circumstances to which the trial court stated:

> The Legislature factored all of that into his age. The Legislature factored all of that into this sentence, which is why under *Montgomery*[2] and *Miller*[3] that it's not automatic life imprisonment without the possibility of parole. There was Supreme Court litigation that said, you know what, because the human brain isn't fully developed until a certain age, because of the impulsivity of youthful offenders, we are not going to throw them away and put them in jail for the rest of their lives without the possibility of parole. The Legislature has already done that, which is why now there is a possibility of parole. That has been done.

The Defense stated that other cases had considered downward departures outside of the habitual offender context, including the Fifth Circuit Court of Appeal's opinion in *Eugene v. Boutte*, which found that Ms. Eugene, who was convicted of second degree murder and sentenced to life imprisonment, made a prima facie showing of ineffective assistance of counsel on collateral review when her trial counsel failed to correct the trial court's "mistaken belief" that it had no discretion to grant a downward departure from a mandatory life sentence. 21-414, p. 3 (La. App. 5 Cir. 8/12/21), 2021 WL 3569220 (*unpub.*). This Court's opinion in *State v. Ross*, 2015-1113 (La. App. 4 Cir. 12/21/16), 207 So.3d 511 was also cited by the Defense as an example of the factors considered by courts in granting a downward departure. In response, the trial court noted that with the exception of *Eugene*, "[t]here is no sentencing range for second degree murder, therein lies the difference in the distinction."

---

[2] *Montgomery v. Louisiana*, 577 U.S. 190, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016).
[3] *Miller v. Alabama*, 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).

Following this exchange, the trial court allowed Dr. Wright to continue testifying along with the remainder of Appellant's witnesses. In sentencing Appellant, the trial court stated, "[w]hile it's unfortunate and is actually downright disturbing that you experienced hardship and trauma throughout your life, but that information alone doesn't warrant me finding that this sentence is constitutionally excessive."

While the trial court initially questioned whether it had the authority to depart from the mandatory sentence, it did not conclude that it lacked such discretion. Even after the dialogue regarding the trial court's authority to depart from the mandatory sentence, it allowed Appellant to present his remaining witnesses and evidence. The trial court heard from seven witnesses and examined exhibits that detailed Appellant's tumultuous upbringing, exposure to violence, lack of mental health treatment, and desire to express remorse. That the trial court considered these factors is evidenced by its finding that Appellant's upbringing was "downright disturbing." Here, the record suggests that the trial court did not find the sentence to be excessive, nor that it lacked the authority to grant a departure. As such, this assignment is without merit.

In his second assignment of error, Appellant claims that the mandatory minimum sentence he received of life imprisonment with the possibility of parole after serving twenty-five years was excessive.

In *State v. Green*, 2017-0520, p. 3 (La. App. 4 Cir. 11/15/17), 231 So.3d 756, 758, this Court addressed an excessive sentence claim in the context of the imposition of a mandatory minimum sentence, reasoning:

> The Louisiana Constitution guarantees that "[n]o law shall subject any person to . . . cruel, excessive or unusual punishment." That protection allows the judicial branch to determine whether the range of sentences

authorized by a criminal statute is excessive for a particular defendant. The court must start with the presumption that a mandatory minimum sentence is constitutional. In order to rebut that presumption, a defendant must clearly and convincingly prove that he is exceptional. This Court has articulated that exceptional "means that because of unusual circumstances he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case."

If the mandatory minimum sentence is constitutionally excessive then a downward departure is required under [*State v.*] *Dorthey*, [623 So.2d 1276 (La. 1993)]. "A punishment is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime." A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice.

(footnotes omitted).

"A trial court is afforded broad discretion in making sentencing decisions," *State v. Bradley*, 2018-0734, p. 8 (La. App. 4 Cir. 5/15/19), 272 So.3d 94, 99-100, and "a sentence shall not be set aside for excessiveness if the record supports the sentence imposed." La. C.Cr.P. art. 881.4(D). Thus, "[t]he relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Barling*, 00-1241, 00-1591, p. 12 (La. App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43 (citing *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957).

On appellate review of an allegedly excessive sentence, the entire record may be considered, including "any evidence or relevant information introduced at preliminary hearings, hearings on motions, arraignments, or sentencing proceedings," or provided in a "presentence investigation report filed into the record at sentencing." La. C.Cr.P. art. 881.3. "In considering the nature of the offense, both the trial court and reviewing court may assess whether the crime for

23

which defendant has been convicted adequately describes his conduct when the conviction is for a lesser included responsive offense to the crime charged[,]" while "accord[ing] paramount importance to the nature of the conduct proved at trial." *State v. Lewis*, 2009-1404, pp. 7-8 (La. 10/22/10), 48 So.3d 1073, 1077-78.

Additionally, an appellate court generally must determine whether the trial judge has adequately complied with statutory guidelines in La. C.Cr.P. art. 894.1 and whether the sentence is warranted under the facts established by the record. *State v. Wiltz*, 2008-1441, p. 10 (La. App. 4 Cir. 12/16/09) 28 So.3d 554, 561. However, even where there has not been full compliance with La. C.Cr.P. art. 894.1, resentencing is unnecessary where the record shows an adequate factual basis for the sentence imposed. *State v. Stukes*, 2008-1217, p. 25 (La. App. 4 Cir. 9/9/09), 19 So.3d 1233, 1250 (citing *State v. Major*, 96-1214, p. 10 (La. App. 4 Cir. 3/4/98), 708 So.2d 813, 819).

Appellant argues that the trial court erred in not granting a downward departure because he:

> [P]resented clear and convincing evidence . . . to show that, because of the unusual circumstances of his case, he is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.

Appellant also argues that his case "unusual" because "it involves the prosecution of someone under the theory of felony-murder where the person was a juvenile at the time of the offense and had no intent to do anything other than commit a simple robbery." Appellant asserts that because of his age and "particular life experiences," he lacked "good judgment" and "the ability to make the right decision when things went wrong."

The Louisiana Supreme Court has long held that the mandatory life sentence for second degree murder is not unconstitutionally excessive. *See State v. Parker*, 416 So.2d 545, 552 (La. 1982); *State v. Cofer*, 2016-871 (La. App. 3 Cir. 4/15/17), 216 So.3d 313. Recently, this Court, in *State v. Campbell*, 2024-0240, pp. 14-15 (La. App. 4 Cir. 2/5/25), ___ So.3d ___ , 2025 WL 399720, held that a mandatory sentence of life imprisonment with the possibility of parole in twenty-five years for a fifteen-year-old convicted of second degree murder was not excessive.

In the instant case, the record supports Appellant's sentence of life imprisonment with the possibility of parole after twenty-five years. The surveillance footage shows Appellant opening the driver's side door of the victim's car and pointing an object at her while she sat in her car. That object was alleged to be pepper spray, which was later recovered inside the victim's car in such a condition leading Det. Johnson to believe that it had been used. The footage further shows Appellant pulling the victim out of her car and beating her. Then, the footage depicts Appellant entering the driver's seat and driving away as the victim dangled outside of the car. Mrs. Mascar testified to hearing the victim screaming, "let me go" and observed the driver's unsuccessful attempt to dislodge the victim. Det. Johnson testified that the victim was dragged for approximately 700 yards. Dr. O'Sullivan testified that the victim had several "blunt force injuries" – any of which could have been fatal.

Moreover, a review of the January 12, 2024 hearing reflects that the trial court took into consideration factors that might warrant a downward departure. The trial court heard from six, live witnesses—some of whom had known Appellant for his entire life or at least a decade—that detailed his upbringing.

However, the trial court did not find those factors convincing and found no reason that would warrant a downward departure from the mandatory sentence, reasoning:

> Mr. Honore, I do not find that the sentence of life imprisonment without the possibility of parole after 25 is constitutionally excessive or amounts to a mere needless punishment with no rehabilitative purpose. While it's unfortunate and is actually downright disturbing that you experienced hardship and trauma throughout your life, but that information alone doesn't warrant me finding that this sentence is constitutionally excessive.

> I believe that when the Legislature made the changes with *Miller* and *Montgomery*, they are giving you the opportunity for rehabilitation. They are giving you the opportunity to go before a Parole Board in 25 years, so they can actually answer that question, not only can you change but have you changed. This Court cannot, based on speculation of what may or may not happen in the future, sentence you to anything less than a minimum sentence of life imprisonment with an opportunity for parole when I find that this sentence is not constitutionally excessive.

> Contrary to the belief of the Defense, I do not have . . . discretion of sentencing him to less than life and parole unless the condition of excessiveness has been met. Here, it has not been met.

As detailed above, the trial court considered Appellant's circumstances when imposing the mandatory sentence. Accordingly, the record does not reflect that the trial court abused its broad discretion when failing to depart from the sentence prescribed by law.

**CONCLUSION**

For the foregoing reasons, we affirm the Defendant/Appellant's conviction and sentence.

**AFFIRMED**